**UNITED STATES COURT OF APPEALS**

**For the Fifth Circuit**

---

No. 98-50892

---

FIDEL G. LOZA,

Plaintiff-Appellant,

VERSUS

KENNETH S APFEL, COMMISSIONER OF SOCIAL SECURITY,

Defendant-Appellee.

---

Appeal from the United States District Court
For the Western District of Texas

---

July 13, 2000

Before DUHÉ, BARKSDALE and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:

The Commissioner of Social Security, concluding that Fidel G. Loza ("Mr. Loza") was not disabled within the meaning of the Social Security Act, denied his claim for Social Security disability insurance benefits. *See* 42 U.S.C. § 423 (1991). Mr. Loza brought an action in the district court for judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g) (1991). The parties consented to have the case reviewed by a magistrate judge who affirmed the Commissioner's decision. Mr. Loza appealed. We

reverse the district court judgment and remand the case for further proceedings as set forth in the conclusion of this opinion.

## I.    FACTUAL BACKGROUND

Fidel G. Loza was born on July 26, 1949.  He completed elementary and secondary schools through the ninth grade and later obtained a G.E.D.  He studied drafting at A.C.C. (Austin Community College) for three years but did not complete the course.  The record does not reflect his work experience prior to military service.  Mr. Loza served on active duty in the United States Army in Vietnam during the war from July 2, 1969 to July 1, 1970.  He served in combat and was wounded three times in the line of duty.  After his military service, he was employed by Glastron Boat Works from 1970 to 1973.  Following that he worked sporadically as a used car lot porter and as a kennel attendant.  In 1973 or 1974 the Veterans Administration (VA) determined that Mr. Loza was 100 percent permanently disabled, service connected, and therefore entitled to veteran's disability benefits.  Mr. Loza has not engaged in any substantial gainful activity since 1975.

Mr. Loza applied for Social Security disability insurance benefits on June 10, 1993 when he was 43 years old.  His claim was denied at the initial determination level in 1993.  Upon his request, he received a hearing before an Administrative Law Judge (ALJ) on November 18, 1994.  The ALJ decided on September 28, 1995 that Mr. Loza was not entitled to a period of disability or to

disability insurance benefits under Sections 216(i) and 223 of the Social Security Act. The Appeals Council denied his request for review on October 22, 1996, and the district court, by a magistrate judge's decision, affirmed the Commissioner's determination on August 14, 1998.

Mr. Loza's Social Security earnings record establishes that he was insured for the purpose of entitlement to a period of disability and disability insurance benefits through June 30, 1980. In order for him to be entitled to benefits, it must be established that he had a disabling impairment or combination of impairments on or between April 27, 1979 and June 30, 1980. Due to the unusually detailed nature of Mr. Loza's medical records and the value of both prospective and retrospective medical evidence, *see Ivy v. Sullivan*, 898 F.2d 1045, 1049 (5th Cir. 1990)*; Rivas v. Weinberger*, 475 F.2d 255, 258 (5th Cir. 1973), a comprehensive summary of the claimant's medical records follows.

During Mr. Loza's active duty military service in Vietnam from July 2, 1969 to July 1, 1970, his left leg and other parts of his body were injured by shrapnel in a booby trap explosion in January 1970. He sustained a gunshot wound to his left loin and abdomen in May 1970. On another occasion his leg was pierced by a punji stick. After being evacuated from Vietnam to the United States in 1970, Mr. Loza received treatment for his injuries and their sequela in VA hospitals.

From 1970 to the date of the 1994 ALJ hearing, Mr. Loza received treatment, medications, and therapy at VA hospitals for Organic Brain Syndrome ("OBS"), Post Traumatic Stress Disorder ("PTSD"), anxiety, insomnia, headaches, arthritis, elbow surgery, and pain in his upper and lower back. According to the VA records he reported that he had hallucinations, nightmares, and flashbacks related to the Vietnam war, as well as memory loss, hearing loss, concentration loss, lack of anger control, domestic conflicts with his wife and children, and withdrawal from social contacts.

Mr. Loza apparently has never been examined, treated or evaluated by any physician other than the VA doctors. The medical evidence of record consists only of copies of the VA records pertaining to his hospitalizations, examinations, treatments and therapy related to his 100 percent service connected disability and other medical problems. The Commissioner and the ALJ did not have Mr. Loza medically examined or evaluated for the purpose of determining whether he is entitled to Social Security disability insurance benefits.

The VA hospital and medical facility records reflect that, on March 21, 1974, Dr. R.W. Gaylord, M.D., examined Mr. Loza and diagnosed him as having chronic brain syndrome and psychosis due to trauma. The doctor also noted that Mr. Loza had left flank and lumbar-sacral pain for which he had been hospitalized twice since 1970. Dr. Gaylord found that some of his symptoms were not related

4

to a detectable anatomical abnormality and concluded that Mr. Loza was in need of psychiatric evaluation and medications.  He ordered that Mr. Loza be admitted to the VA hospital psychiatric ward.

When a psychiatric ward bed became available on April 8, 1974, Mr. Loza was admitted to the VA Center (Olin R. Teague Veterans Hospital) in Temple, Texas.  His medical history indicates that he complained of pain in his left side which began after he was wounded by gunshot in Vietnam in May 1970. He also reported a burning sensation in his side when he lifted 25 to 50 pounds; pain in his upper and lower back; headaches from stooping that started after his injury by a booby trap explosion in Vietnam in January 1970; pain caused by shrapnel in his left foot and other parts of his body; insomnia due to the pains in his side and back; easily aroused anger; auditory and visual hallucinations in 1970 after his evacuation from Vietnam; and a recurrence of a hallucination six months prior to his hospital admission.[1]

Dr. H.P. Reveley, M.D., noted during his examination of Mr. Loza at the VA hospital on April 9 and 10, 1974 that the veteran's interpretation of proverbs implied impairment of his abstract thinking; that Mr. Loza reported trouble with his hearing that required persons speaking to him to sometimes repeat questions 3 to 4 times; that Mr. Loza was said to be service-connected for chronic

---

[1]  Mr. Loza reported that as he was hammering on his porch, he visually hallucinated a person charging him from a shed, and he grabbed his hammer as if it were a rifle.

5

brain syndrome[2] due to trauma with headaches, tinnitus,[3] and post

traumatic nervous condition[4]; that he sustained a gunshot wound to

[2] **Organic Brain Syndromes (OBS)** are "a heterogenous class of conditions caused by brain tissue dysfunction due to abnormalities of brain structure or secondary to alterations of brain neurophysiology or neurochemistry. In all cases, there is a failure of normal metabolic processes in the brain leading to a cognizant loss characterized by impairment of four major areas: 1) orientation; 2) memory; 3) intellectual functions (comprehension, calculation, learning); and 4) judgment. According to the Diagnostic and Statistical Manual of Mental Disorders, Third edition-Revised (DSM-III-R), the essential feature of all organic mental disorders is a psychological or behavioral abnormality associated with transient or permanent dysfunction of the brain. In some cases, the origin of the dysfunction is readily identified with diagnostic tools such as computed tomography (CAT) scanning of the brain, magnetic resonance imaging (MRI) of the brain, or electroencephalography (EEG) which reveals the electrical brain wave patterns. In other cases, it is impossible to identify the underlying abnormality in brain structure or function accounting for the behavioral changes, but an organic cause can be inferred from characteristic physical findings." 5 Robert K. Ausman, M.D., and Dean E. Snyder, J.D., <u>Ausman & Snyder's Medical Library Lawyers Edition</u> § 8:49, at 431-32 (1990).

[3] **Tinnitus:** A sound in one ear or both ears, such as buzzing, ringing, or whistling, occurring without an external stimulus and usually caused by a specific condition, such as an ear infection, the use of certain drugs, a blocked auditory tube or canal, or a head injury. *See* <u>The American Heritage Dictionary of the English Language</u> 1879 (3rd ed. 1992); *see also* <u>Stedman's Medical Dictionary</u> 1816 (26th ed. 1995).

[4] **Posttraumatic Stress Disorder:** The essential feature of the disorder is "the development of characteristic symptoms following exposure to an extreme traumatic stressor involving direct personal experience of an event that involves actual or threatened death or serious injury, or other threat to one's physical integrity; or witnessing an event that involves death, injury, or a threat to the physical integrity of another person; or learning about unexpected or violent death, serious harm, or threat of death or injury experienced by a family member or other close associate...The characteristic symptoms resulting from the exposure to the extreme trauma include persistent reexperiencing of the traumatic event, persistent avoidance of stimuli associated with the trauma and

the left loin and abdominal region in May 1970, had multiple metallic fragments in the arms and legs from the booby trap explosion in May 1970, and had a small stab wound to the left leg; and he may have had allergic reactions to medication received in Brooke General Hospital in 1970.  The initial impressions of Dr. Reveley were: "(1) chronic brain syndrome secondary to trauma, remote (s.c.) [service connected]; and (2) scars, left flank and lateral abdominal muscles from prior gunshot wound."

Mr. Loza was discharged from the VA hospital in Temple, Texas on April 25, 1974.  Dr. Reveley recorded the following diagnoses upon discharge: "(1) nonpsychotic brain syndrome due to trauma, remote (s.c.) [service connected]; (2) weakness of left flank and lateral abdominal muscles (s.c.) [service connected]; and (3) adjustment reaction of adult life with marital conflicts."  The previous day Dr. Reveley had entered a provisional diagnosis of Mr. Loza's condition as  "Severe anxiety/chr. brain syndrome."

Dr. Reveley's report also noted that Mr. Loza suffered from depression and nerve disorders and that antipsychotic medications

---

numbing of general responsiveness, and persistent symptoms of increased arousal....Stimuli associated with the trauma are persistently avoided....The individual has persistent symptoms of anxiety or increased arousal that were not present before the trauma.  These symptoms may include difficulty falling or staying asleep that may be due to recurrent nightmares during which the traumatic event is relived, hypervigilance, and exaggerated startle response.  Some individuals report irritability or outbursts of anger or difficulty concentrating or completing tasks."  *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders  (DSM-IV) 309.81, at 424-25 (1994).

were prescribed for him. Mr. Loza was placed on Haldol[5] and advised to take 2 mg at bedtime. Dr. Reveley noted that Mr. Loza "required hospitalization for treatment of his nerves throughout." Mr. Loza admitted to bouts of depression every day but denied suicidal ideation. While in the hospital he participated actively in group therapy conferences. Because Mr. Loza did not want to remain in the hospital for psychotherapy, he was referred to the human development center at the MHMR center in Travis County, Austin, Texas. He was to return to see Dr. Reveley in 28 days for follow-up treatment for his service connected, nonpsychotic OBS. Although he was considered competent to handle funds due him, he needed a 90 day period of convalescence.

On April 25, 1974, Dr. Reveley stated that Mr. Loza "cannot return to full employment." He further noted Mr. Loza's physical problems: pain in lumbosacral area, weakness of left flank and left lateral abdominal muscles, burning in side upon lifting 25 to 50 pounds, lower and upper back pain. Dr. Reveley noted that Mr. Loza had been hospitalized in July 1973 with similar complaints. An orthopedic specialist reported to Dr. Reveley that Mr. Loza's lack of musculature in the left flank created a postural problem which resulted in pain in Mr. Loza's left lumbar area. Dr. Reveley noted

---

[5]  Haldol is a brand of haloperidol, which is the first of the butyrophenone series of major tranquilizers. It is indicated for use in the management of manifestations of psychotic disorders. *See* Physicians' Desk Reference 2155-56 (54th Ed. 2000).

that Mr. Loza had been referred for physiotherapy, and that an X-ray of the "lumbosacral spine" on August 8, 1973 showed metallic fragments in left flank.  An X-ray of the "cervical spine" showed loss of cervical lordosis.

Mr. Loza was examined and treated by Dr. Reveley at the VA hospital on November 22, 1974, February 7, 1975, and June 26, 1975. He complained of worsening headaches, sore left shoulder, anxiety, hyperventilation, vertigo as in Meniere's syndrome, and poor hearing since the 1970 booby trap explosion.  Dr. Reveley prescribed Haldol and Darvon[6] for Mr. Loza's conditions on each visit.

Mr. Loza was seen by someone named Johnson at the "OPMHC" ("out patient medical hospital clinic" perhaps) of the VA Hospital on April 8, 1977.  Johnson's initials and profession are not clear from the record.  Johnson noted: "Increasing headaches No psychiatric Condition to account for headaches Don't agree previous dx of OBS Suggest neurological consult EEG & shall [undecipherable] today. [a whole illegible sentence here] RTC ["return to clinic" perhaps] 12 wks."  In the margin are notes suggesting the

---

[6]Darvon is propoxyphene, a narcotic analgesic used to relieve mild or moderate pain.  *See* The American Medical Association Guide to Prescription and Over-the-Counter Drugs 469 (1st ed. 1988).

scheduling of "EEG 5-10-77," "Neurological 5-10-77," and "MHC 6-13-77".  The notation also mentions "Acetaminophen."[7]

On June 13, 1977, over a similar "Johnson" signature an entry under the heading "OPMHC" appears as follows: "Neuro can't find anything wrong w[ith] this pt either[?] so maybe secondary gain factors play a dominant role.[8]  Cont[inue] present regimen[.]  RTC 12 wks[.]"

The preceding are the only entries in the record by Johnson. The record does not reflect whether Johnson was a doctor, nurse or some other type of medical technician.  The entries are brusque and cryptic, and they appear to have been made without taking or reading Mr. Loza's medical history or consulting the treating VA physicians.  All of Mr. Loza's treating physicians consistently diagnosed and treated Mr. Loza for OBS, PTSD, or a similar mental or emotional disorder.  Johnson expressed doubt but did not change the diagnosis and ordered the continuance of the regimen prescribed by Dr. Reveley and the other treating doctors.

On July 23, 1979, Mr. Loza was seen at "OP/MHC" by a doctor whose signature is mostly illegible, except for a clear, bold

---

[7]Acetaminophen is a non-narcotic analgesic used to relieve pain and reduce fever.  *See* The American Medical Association Guide to Prescription and Over-the-Counter Drugs, at 215.

[8] Secondary gain factors are the interpersonal or social advantages, such as attention, assistance, or sympathy, a person gains indirectly from having an organic illness.  *See* Stedman's Medical Dictionary, 698 (24th ed. 1982).

"M.D." behind his name.  The doctor noted: "Remains stable but c[?] the same somatic discomfor[ts?] Wife works and he stays home drawing 900 some dollars."  The doctor prescribed Haldol and Ascriptin[9] for Mr. Loza's condition and scheduled him to "RTC in 24 wks."

On September 17, 1979, "V. Deinna[?] RN" saw Mr. Loza at the VA hospital, recorded that he suffered a sudden onset of severe upper back pain 5 days ago, and that his right great toe was very painful to touch.  Another entry below that in different handwriting added that Mr. Loza had back pain, neck to buttocks last 5-6 days and has "trauma, VTmiN[?] Pmh[?] nervous disorder." The notation indicated that Haldol and Ascriptin had been prescribed for Mr. Loza's disorders.

On October 8, 1980, Mr. Loza was examined and treated by Dr. Flore, M.D., at the mental hygiene clinic of the VA hospital.  The doctor continued to diagnose Mr. Loza's problem as "non psychotic Organic Brain Syndrome" and "post traumatic neurosis."  The patient reported a two day pulsating headache, disturbed sleep, and less frequent nightmares.  Dr. Flore determined that Stelazine[10] had

_____

[9]Ascriptin is a combination of aluminum hydroxide, an antacid, and codeine, a narcotic analgesic.  *See* The American Medical Association Guide to Prescription and Over-the-Counter Drugs, at 224, 291.

[10]Stelazine is trifluoperazine, a phenothiazine antipsychotic agent used for the symptomatic management of psychotic disorders and for the short-term management of nonpsychotic anxiety.  *See* American

11

been effective for Mr. Loza's anxiety. Dr. Flore prescribed Stelazine, Benadryl[11] and Darvon for Mr. Loza for the treatment of his mental, emotional and other illnesses.

On January 21, 1981, Mr. Loza began therapy at the mental hygiene clinic of the VA hospital where he was observed mainly by Dr. J.M. Cooney, Ph.D., and registered nurses. The record reflects that he visited the clinic on May 27, 1981, June 4, 1981, August 28, 1981, December 23, 1981, March 24, 1982, June 23, 1982, June 28, 1982, September 22, 1982, December 16, 1982, June 22, 1983, September 28, 1983, December 14, 1983, March 9, 1984 and June 1, 1984. During this period Mr. Loza reported that he suffered from headaches, dizzy spells, fainting and frequent neck pain. He was administered Vistaril and Ascriptin. Dr. Flore noted his diagnosis of OBS and posttraumatic neurosis on June 4, 1981 and August 28, 1981. On December 23, 1981, Dr. Cooney acknowledged Mr. Loza's OBS diagnosis and recounted that Mr. Loza suffered from headaches three to four times a week. On March 9, 1984, Dr. Cooney observed that Mr. Loza still had frequent headaches and losses of temper, but no thought disorder. Dr. Cooney on March 9, 1984, June 4, 1984,

---

Hospital Formulary Service Drug Information 2000, 2112 (42nd ed. 2000).

[11]Benadryl is diphenhydramine, an antihistamine used to treat allergies and movement disorders caused by antipsychotic drugs. *See* The American Medical Association Guide to Prescription and Over-the-Counter Drugs, at 317.

September 4, 1984, February 5, 1985 and August 20, 1985 consistently assessed Loza's condition as "anxiety disorder" and recognized a need for review of the patient's medications.

On February 19, 1986 the VA records reflect complaints of back pain and headaches and the use of crutches because of foot pain. The treating physician assessed Mr. Loza's condition as "Chronic pain; anxiety, generally well controlled." Medical progress notes dated March 13, 1986 reflect that Mr. Loza was continued on Vistaril[12] and Ascriptin by an M.D. whose identity is unclear from the record. On May 14, 1986 and September 10, 1986, Mr. Loza complained of headaches, insomnia, and was again assessed as having "anxiety." A December 2, 1986 assessment performed by Dr. Cooney noted that Mr. Loza lost his temper frequently but found no evidence of "major depression." On March 3, 1987, Dr. Cooney made an assessment of "nonpsychotic Brain Syndrome" and called for a referral to an M.D. to review medications.

On March 24, 1987 and June 22, 1987, Mr. Loza was seen by Dr. Gaylord, who diagnosed and treated his painful right foot as "Metatarsalgia, right foot."

---

[12]Vistaril is hydroxyzine, a piperazine-derivative antihistamine used for the symptomatic management of anxiety and tension associated with psychoneuroses and as an adjunct in patients with organic disease states who have associated anxiety. *See* American Hospital Formulary Service Drug Information 2000, at 2227.

On September 1, 1987, Dr. Gaylord saw Mr. Loza and noted his complaints of severe pain of the right elbow which started approximately 4-6 weeks prior and had gotten progressively worse; he was unable to flex or lift anything because of severe pain. Dr. Gaylord diagnosed his condition as "acute Tendinitis, Bursitis of the right elbow." The doctor started Mr. Loza on Motrin and continued a prescription for Allopurinol.[13] On October 1, 1987, Dr. Gaylord found that Mr. Loza's painful right elbow had not improved, sent for splint and referred him to Orthopedics. On December 28, 1987, he was seen by someone in Orthopedics whose signature is unclear who ordered an increase in his Ascriptin.

On February 12, 1988, Dr. Gaylord saw Mr. Loza who complained of back pain which he related to a back injury in military service. The doctor diagnosed "low back syndrome, acute," and prescribed continuation of same medicines, hard mattress, 2-3 hot baths daily and no lifting.

On March 1, 1988, Dr. Cooney entered this assessment: "100 percent service connected veteran – service connected for chronic brain syndrome - Hx of anxiety - I see no evidence of significant psychiatric disturbance - refer to M.D. to review medication." On September 6, 1988, Dr. Cooney made the same OBS assessment and

---

[13]Allopurinol is used primarily in the management of gout but the drug also serves to lower high uric acid levels (hyperuricemia) caused by other drugs. *See* The American Medical Association Guide to Prescription and Over-the-Counter Drugs, at 221.

14

referred to an "M.D." who advised Mr. Loza to take 50-100 mg Vistaril. On March 6, 1989, Dr. Cooney recorded that Mr. Loza was service connected for "'nonpsychotic brain syndrome,' as well as other injuries he sustained in combat in Vietnam - He complains of memory and concentration difficulties and occasional anxiety."

Progress notes taken by Dr. McCord on August 9, 1989 recognize Mr. Loza's diagnosis of anxiety and OBS. Mr. Loza complained of headaches, an ear infection, and leg, arm and back pain. Dr. McCord described Mr. Loza's difficulties in managing the behavior of his daughter, and assessed Mr. Loza as suffering from mild anxiety. On November 8, 1989 and February 7, 1990, Dr. McCord's progress notes indicate that Mr. Loza again complained of pain in his arm, elbow and legs but no serious mental problems were detected.

On October 20, 1990, Dr. David Howie, M.D., assisted by Dr. Shapiro, M.D., and Dr. Taylor, M.D., performed surgery on Mr. Loza's right elbow. The chief complaint, pertinent history, and condition on admission was: "greater than one year right lateral epicondylitis [which] continued to progress despite concentrated treatment including NSAIDS, analgesics and elbow wrap." The major operation performed consisted of a lateral epicondylar repair (conjoined tendon recession, partial annular ligament resection, partial ostectomy of lateral epicondyle). Mr. Loza was hospitalized August 19-21, 1990. He was discharged with his elbow

15

to remain in a cast and with instructions to engage in no vigorous activity.

In the fall of 1990 Mr. Loza's wife divorced him and had the court award him custody of their two children, ages 9 and 17. On March 25, 1991, a long history was entered in Mr. Loza's VA hospital medical record, perhaps in connection with his transfer to the out patient clinic. It was again noted that he suffered service connected brain injury, abdominal wall impairment and lumbosacral strain; the assessment of his problems remained: Non Psychotic OBS and "adjustment to adult life secondary to marital problems."

On November 23, 1992, Mr. Loza was referred and accompanied by a VA counselor, Ruben Cano, M.S.W., to see Dr. George Clay, a medical doctor at the VA hospital. Mr. Loza reported feeling depressed. Mr. Cano said that Mr. Loza's appetite fluctuated and he withdrew from others. Dr. Clay noted that Mr. Loza "tends to isolate" and opined that he was "not sure he (Loza) has much hope for the future." Mr. Loza said, "I sit down and wonder whatever happened to my life." Mr. Loza reported that he had experienced insomnia; a bad memory due to OBS; a suicide attempt which failed because the gun jammed; occasional feelings of worthlessness; and a desire not to live in the pain he suffered. Nevertheless, Mr. Loza denied having any current suicidal thoughts. Mr. Cano

16

suggested that Mr. Loza transfer to the VA Waco PTSD unit. Nortriptyline[14] was prescribed for his depression.

On December 28, 1992, Mr. Loza was seen by Dr. Marcia Michals, Ph.D. Mr. Loza reported no side effects to taking Nortriptyline, except dry mouth. He did not feel that the medicine was helping him and his sleep was still disturbed. He did not exercise and he slept only 2-4 hours each night. The doctor tripled Mr. Loza's Nortriptyline intake. A February 19, 1993 appointment with Dr. Michals revealed that Mr. Loza still suffered from nightmares and slept only 3 to 4 hours per night, but Mr. Loza claimed to feel "more calm" and had no crying spells since beginning Nortriptyline. However, by February 25, 1993 Mr. Loza reported nightmares, flashbacks and depression to Dr. Michals. Mr. Loza reported to Dr. Michals on February 26, 1993 that his sleep difficulties, nightmares and flashbacks had continued, and that he had difficulty controlling his anger and had even struck his son the previous evening.

Mr. Loza participated in VA sponsored group therapy sessions from March 24, 1982 until March 9, 1984 and has continued to attend monthly group sessions since April 25, 1991. Mr. Loza's first two

---

[14]Nortriptyline is a dibenzocycloheptene-derivative tricyclic antidepressant. *See* American Hospital Formulary Service Drug Information 2000, at 2036.

years in group therapy went poorly.  Dr. Cooney noted that Mr. Loza appeared "slightly defensive and reluctant to speak in group."

Dr. Cooney removed Mr. Loza from group therapy on March 9, 1984 and initiated individual therapy.  The individual sessions which occurred before and after 1984 reveal some of Mr. Loza's continuing emotional difficulties.  During an individual session with Dr. Cooney on March 24, 1982, Mr. Loza described an incident in which he became angry with his wife and attempted to shoot himself, only to fail because the weapon would not load.  During a December 2, 1986 interview with Dr. Cooney, Mr. Loza indicated he was experiencing difficulty managing the behavior of his 13 year old daughter.  In a March 3, 1987 counseling session, Mr. Loza expressed recurring doubt about the effectiveness of his medication and described his propensity to become angry with family members. A September 1, 1987 consultation typifies many of the record entries by recounting Mr. Loza's difficulty sleeping and his recurring delusions concerning the presence of unknown individuals in his home at night.

Although Mr. Loza preferred individual sessions with Dr. Jeff Cooney and Dr. M. McCord he reentered group counseling with other veterans at the Veterans Readjustment Counseling Center #703, or the "Vet Center", in Austin, Texas.  Progress notes made during these meetings by Dr. McCord portray Mr. Loza as withdrawn, suffering from physical pain, depression, isolation, headaches,

18

feelings of worthlessness and recurrent auditory and visual hallucinations.

In group therapy on February 26, 1993, Dr. McCord noted that Mr. Loza was "not doing well", felt depressed and was not sleeping. During an August 26, 1993 group therapy session at the Vet Center, Dr. McCord reported that Mr. Loza "talked reluctantly about his near death experiences" but was "relieved to discover others in group had similar experiences." On October 28, 1993, Mr. Loza told the group about a "recent incident in which he witnessed an auto accident and later, when some helicopters flew over, (he) had a flashback (to Vietnam)." A member of the therapy group, who had received treatment at the VA Waco PTSD unit, recommended that Mr. Loza seek admission to that facility. But Mr. Loza replied he could not leave Austin because he had to care for his son.

On October 29, 1993, Mr. Loza confessed to VA social worker Paul Berclof, A.C.S.W., M.S.W., that he had been depressed and plagued by Vietnam nightmares since he quit taking his prescribed medication. Mr. Loza told Mr. Berclof that he wanted to try antidepressants again. Mr. Loza and Mr. Berclof agreed on a plan: the patient would meet with Dr. Michals, request permission to start taking antidepressant medicine again, work with Mr. Berclof and Mr. Cano concerning his Vietnam nightmares, and abstain from drinking while on medication.

19

On the same day, Mr. Loza saw Dr. Michals and reported the flashback incident that he had described to his therapy group. He also complained of pain from his old injuries. Dr. Michals prescribed Sertraline[15] as treatment for Mr. Loza's medial disorders.

On November 17, 1993, Vet Center therapists Ruben Cano and John Ferguson stated that they had examined Mr. Loza and counseled him over the past several years in individual and group sessions with regard to his Vietnam experiences. In their opinions, Mr. Loza exhibited symptomology characteristic of Post-Traumatic Stress Disorder (PTSD).

During a November 30, 1993 visit with Dr. Michals, Mr. Loza stated that his condition had improved after being placed on the antidepressant Sertraline. However, on December 30, 1993 Dr. Michals made the following entry showing a deterioration of Mr. Loza's mental condition: "Vet states he has had a bad headache, doesn't remember if he took Ibuprofen. Complained of temper outbursts since decreasing Sertraline, family stays away....Suggested pill container to help vet remember if he's taken

---

[15]Sertraline is a naphthalenamine-derivative antidepressant agent. The drug is used in the treatment of depressive affective (mood) disorders such as major depression. A major depressive episode implies a prominent and relatively persistent depressed or dysphoric mood that usually interferes with daily functioning (nearly every day for at least 2 weeks). *See* American Hospital Formulary Service Drug Information 2000, at 2075-87.

meds each day." Mr. Loza continued to attend his monthly veterans'
group meetings in December 1993 and January 1994. At each meeting,
Mr. Loza complained of serious physical pain.

At Mr. Loza's group counseling meetings with Dr. McCord on
April 28, 1994, May 26, 1994, June 23, 1994 and July 28, 1994, Mr.
Loza spoke of his "continuing problems with Vietnam" and his
recurring nightmares. At the April 28, 1994 meeting of the retired
veterans' group, Mr. Loza spoke of thinking about Vietnam when he
became stressed. On May 26, 1994, Dr. McCord noticed that Mr. Loza
appeared upset that a Vet Center counselor he relied on had been
suspended, and Mr. Loza felt his "support" was gone. Dr. McCord
observed that Mr. Loza appeared "alert, somewhat anxious and
angry", and assessed Mr. Loza's condition as "PTSD." At the June
23, 1994 meeting Mr. Loza spoke of his continuing nightmares. At
the July 28, 1994 meeting Mr. Loza spoke to the group about his
"continuing problems with Vietnam."

The record is replete with evidence of Mr. Loza's social
isolation. On April 9, 1974, April 25, 1974, December 14, 1983,
February 6, 1991, May 30, 1991, September 26, 1991 and November 23,
1992, the record shows numerous observations by therapists that Mr.
Loza often "isolates" himself from other people. On April 9, 1974,
Dr. Reveley reported Mr. Loza's "phobic trends" involving his
refusal to enter a theater with other people present, and on April
25, 1974 noted Mr. Loza's "adjustment reaction of adult life with

21

marital conflicts." Dr. Cooney repeatedly observed (in particular on December 14, 1983) that Mr. Loza appeared defensive and reluctant to participate in group therapy. Dr. McCord noted in a report on February 6, 1991 that Mr. Loza expressed a preference for individual counseling and sought to avoid group sessions. After convincing Mr. Loza to attend group therapy sessions, Dr. McCord made numerous notations through 1991 and 1992 concerning Mr. Loza's reluctant participation in group settings. A November 23, 1992 a doctor's entry noted Mr. Loza's tendency to isolate himself from others.

Mr. Loza's separation and divorce from his wife, lack of friends and estrangement from his brothers and sisters further evince his social withdrawal. During the ALJ hearing Mr. Loza testified: "I guess the only friend I have right now would be my neighbor. He'll invite me once in awhile, you know, call me and have coffee with him or sometimes he knows that I'm sick...And he's the only one I can think of right now." In a disability report Mr. Loza filled out at the request of the Social Security Administration, he described his "social contacts" as consisting of "one friend" he fished with occasionally and his mother whom he visited every two to three months. Mr. Loza's clinical record from April 9, 1974 indicated that he had two brothers and seven sisters in south Texas with whom he had no contact.

22

At the ALJ hearing Mr. Loza testified to other war-related symptoms of his OBS or PTSD, including "losing concentration a lot", headaches, having trouble sleeping for weeks at a time, recurrent blackouts, bouts of anger, nightmares, hallucinations and Vietnam War "flashbacks." Mr. Loza testified to his hallucinations associated with the sounds of helicopters or loud explosions. Mr. Loza also testified that as he was rendering assistance to an auto accident victim, a rescue helicopter flew over, and he hallucinated that he was in combat again in Vietnam. Mr. Loza further testified that he was nervous in public places and had hardly any friends or relationships other than his mother, ex-wife and two children. Mr. Loza also entered into the administrative record a disability card issued by the Department of Veterans' Affairs showing him to be 100 percent disabled.

Mr. Loza's former wife, Janie Loza, and daughter, Michelle Tanguma Loza, gave statements concerning his change in personality and behavior following his return from Vietnam:

> My name is Janie Loza, ex wife of Fidel Loza. We were married from Jan-3-70 to Feb-4-90. Fidel was sent to Vietnam in the end of January. A few months later [he] was shot in combat and was sent home to a hospital to recover. When he was released and sent home that's when the problems started. Fidel had recurrent nightmares, suffered from paranoia of being in crowded places and of people. The sound of a fire cracker would send him to the ground. One day we were going down a highway and a car backfired and he suddenly told me to duck because they were gunshots. One of his night mares he had was to start crawling around the bed in the middle of the night while he was asleep. I would ask him about it the next

23

morning and he would not have any recollection of it happening. Up to this day [11-10-93] he still has flashbacks. A few weeks ago he was at my house and I turned on the ceiling fan and as soon as he heard the noise the fan was making he had to leave because it sound to[o] much like a chopper overhead. (Helicopter) The young man I said good-bye to after only a couple of weeks being married to and was sent to war never returned. Instead a stranger came home a young man old before his time with shattered hopes and dreams. And I didn't know how to help him or understand him because he is [not] the only one, and many others like him that experienced the War in Vietnam, and it will stay with them until the day they die.

Regards,<br>S/Janie T. Loza

Let me start by telling you who I am. My name is Michelle Tanguma Loza. I am 20 years old. I've lived with my father all these years. Through these years I've seen my father go through some harsh pains. He looks like a very healthy man outside, but inside he has a lot going on in their(sic). For one he has constant migraine headaches, these headaches, at times don't let him relax and make him irritable at times. These headaches occur quite frequent more than regular headaches. He also has bad feet. He can't be on his feet for long periods of time if he's on his feet for a few hours as soon as he gets off his feet, takes his shoes off his feet swell like balloons. Once his feet swole up so bad his feet, well his toes didn't touch the carpet his bottom of his foot had blown up. We constantly massage his feet for him to soothe the pain or he soaks them in hot water.

He also had some problems with one of his arms he couldn't lift anything that was very heavy. He had to get that arm operated on. He was then receiving very painful shots in the elbow. His elbow is still very tender.

My Father also has very bad back problems. Their have been many mornings where he was unable to even sit up in bed. He was getting out of his truck once and his back went out. My mother and I practically carried him into the house because he was unable to get out of his truck by himself.

The colder weather, a lot of times keeps him in bed because of body aches. When my father stays in bed late it's because he's not feeling well he's usually up very

early if he feels well.

I also know my father has a lot of feelings inside about Viet Nam. I can tell by the look in his eyes and a lot of poetry he's written about that place. He has never really talked about it but a lot of his poetry says a lot.

I think it's not fair my father went to Viet Nam and fought and now has to pay for it everyday of the rest of his life.

## II. STANDARD OF REVIEW

On judicial review, the ALJ's determination that a claimant is not disabled will be upheld, if the findings of fact upon which it is based are supported by substantial evidence on the record as a whole, and if it was reached through the application of proper legal standards. *See* 42 U.S.C. § 405(g); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

## III. DISCUSSION

Mr. Loza argues that the ALJ's determination was not based on findings of facts supported by the record as a whole, and that the ALJ did not apply the proper legal standards in determining that his mental impairment was non-severe, in applying the medical-vocational guidelines to a case in which there are non-exertional impairments, and in failing to analyze the combined effects of all his physical and mental impairments.

### A. Overview of Legal Principles Applicable

The Social Security Act provides for the payment of insurance benefits to persons who have contributed to the program and who

suffer from a physical or mental disability. *See* 42 U.S.C. § 423(a)(1)(D) (1991). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months...." 42 U.S.C. § 423(d)(1)(A); *Bowen v. Yuckert,* 482 U.S. 137, 140 (1987); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992). The Act further provides that an individual is disabled "only if his physical and mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A).

The Secretary promulgated regulations establishing a five step sequential evaluation process for deciding whether an individual is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920. The first two steps involve threshold determinations that the claimant is not presently engaged in substantial gainful activity and has an impairment or combination of impairments which significantly limits his physical or mental ability to do basic work activities. *See* 20 C.F.R. §§

26

404.1520, 404.1520(b)-(c), 416.920, 416.920(b)-(c). In the third step, the medical evidence of the claimant's impairment(s) is compared to a list of impairments presumed severe enough to preclude any gainful activity. *See* 20 C.F.R. pt. 404, subpt. P, App. 1 (pt. A) (1999). If the claimant's impairment matches or is equal to one of the listed impairments, he qualifies for benefits without further inquiry.[16] *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). If the person cannot qualify under the listings, the evaluation proceeds to the fourth and fifth steps.[17] At these steps, analysis is made of whether the person can do his own past work or any other work that exists in the national economy, in view of his age, education, and work experience. If he cannot do his past work or other work, the claimant qualifies for benefits. *See* 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f); *Sullivan v. Zebley*, 493 U.S. 521, 525-26 (1990); *Yuckert*, 482 U.S. at 141-42; *Anthony,* 954 F.2d at 293.

---

[16]"If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is conclusively presumed to be disabling, the evaluation proceeds to the fourth step...." *Yuckert*, 482 U.S. at 141-42 (citing 20 C.F.R. §§ 404.1520(e), 416.920(e)).

[17]*See Sullivan v. Zebley*, 493 U.S. 521, 532 (1990) (citing *Yuckert*, 482 U.S. at 141) ("if an adult's impairment 'meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is conclusively presumed to be disabling, the evaluation proceeds to the fourth step[.]'").

In *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985), this court was confronted with another in a series of cases in which a decisive administrative determination was made against disability at step two on the grounds of non-severity through a literal application of the Secretary's "severity" or "significant limitation" regulation.[18] The *Stone* court pointed out that this Circuit had construed the regulation as setting the following standard in determining whether a claimant's impairment is severe: "'[A]n impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience.'" *Stone*, 752 F.2d at 1101 (quoting *Estran v. Heckler*, 745 F.2d 340, 341 (5th Cir. 1984) and citing *Martin v. Heckler*, 748

---

[18] The current version of this regulation has not changed since *Stone* considered it in 1985 except for the addition of the phrase "or combination of impairments", and reads:

> (c) *You must have a severe impairment*. If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience. However, it is possible for you to have a period of disability for a time in the past even though you do not now have a severe impairment.

20 C.F.R. § 404.1520(c)(1999).

F.2d 1027, 1032 (5th Cir. 1984); *Davis v. Heckler*, 748 F.2d 293, 296 (5th Cir 1984)).

In *Stone* this court explained that a literal application of the regulation would be inconsistent with the Act and its legislative history.  *See Stone*, 752 F.2d at 1104-05.  Because the severity regulation defined "severe impairment" to include far fewer conditions than the statute indicated, we admonished the Secretary not to use the severity regulation to systematically deny benefits to statutorily eligible claimants.  *See id.* at 1105. "Although we recognized in *Stone* that the fact finder is entitled to follow a sequential process that disposes of appropriate cases at an early stage, we also recognized that it is impermissible to conduct the evaluation in such a manner as to deny benefits to individuals who are in fact unable to perform 'substantial gainful activity.'"  *Anthony*, 954 F.2d at 293 (quoting *Stone,* 752 F.2d at 1103).

Moreover, the *Stone* court, in censuring misuse of the severity regulation, forewarned that we would "in the future assume that the ALJ and the Appeals Council have applied an incorrect standard to the severity requirement unless the correct standard is set forth by reference to this opinion or another of the same effect, or by an express statement that the construction we give to 20 C.F.R. §

29

404.1520(c) is used." *Stone*, 752 F.2d at 1106; *see also Anthony*, 954 F.2d at 293-94.

After the Supreme Court's decision in *Bowen v. Yuckert*, this court addressed the issue of whether *Yuckert* had altered the standard we announced in *Stone*. *See Anthony*, 954 F.2d at 294. We concluded that it had not:

> *Yuckert* simply upheld the facial validity of the severity regulation as an appropriate method of streamlining the review process. *Yuckert* did not conclude that the severity regulation properly interpreted the statutory requirements, and *Yuckert* did not purport to state the proper definition of the term "severe impairment." Thus, *Stone* is not inconsistent with the Supreme Court's pronouncement in *Yuckert*; *Stone* merely reasons that the regulation cannot be applied to summarily dismiss, without consideration of the remaining steps in the sequential analysis, claims of those whose impairment is more than a slight abnormality.

*Id.* That interpretation of the *Stone* requirements as being consistent with *Yuckert* has been recognized continuously as the view of this Circuit. *See Spellman v. Shalala*, 1 F.3d 357, 364 n.11 (5th Cir. 1993); *Frizzell v. Sullivan*, 937 F.2d 254, 255 (5th Cir. 1991); *Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988); *Rodriguez v. Bowen*, 857 F.2d 275, 278 (5th Cir. 1988). Most other Circuits agree that *Yuckert* does not displace prior limitations on the Secretary's reliance on the severity regulation. *See, e.g., Gilbert v. Apfel,* 175 F.3d 602, 604 (8th Cir. 1999); *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995); *Bailey v. Sullivan*, 885

30

F.2d 52, 56-57 (3d Cir. 1989); *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988); *Yuckert v. Bowen*, 841 F.2d 303, 306 (9th Cir. 1988); *Gonzalez-Garcia v. Secretary of Health and Human Services*, 835 F.2d 1, 2 (1st Cir. 1987); *Stratton v. Bowen*, 827 F.2d 1447, 1453 (11th Cir. 1987); *Brown v. Bowen*, 827 F.2d 311, 312 (8th Cir. 1987) (concluding that a majority of the Supreme Court adopted the standard that "'[o]nly those claimants with slight abnormalities that do not significantly limit any "basic work activity" can be denied benefits without undertaking' the subsequent steps of the sequential evaluation process.")(quoting *Yuckert*, 107 S.Ct. at 2298).[19]

---

[19] This court in *Anthony*, 954 F.2d at 294, n.7 further noted that:

> In *Brown*, the Eighth Circuit concluded that a majority of the Supreme Court adopted a standard that provides that "'[o]nly those claimants with slight abnormalities that do not significantly limit any "basic work activity" can be denied benefits without undertaking' the subsequent steps of the sequential evaluation process." *Brown v. Bowen*, 827 F.2d 311, 312 (8th Cir. 1987) (quoting *Yuckert*, 107 S.Ct. at 2298 (O'Connor, J., concurring)). In so doing, the court noted that five justices--the justices of the concurrence and the dissent--agreed that the language of the severity regulation cannot be used to disqualify those who meet the statutory requirements for disability. Justice O'Connor authored the concurrence in *Yuckert*, joined by Justice Stevens, which expressed concern that the severity regulation, as articulated, might erroneously permit the premature dismissal of claims, but emphasized that this fact did not undermine the facial validity of the regulation. Three other justices--Justice Blackmun, Justice Brennan and Justice Marshall--dissented.
> It is unclear whether Justice O'Connor intended to

31

**B. The ALJ's Determination That Mr. Loza's Mental Impairment Was Non-Severe Was Based On An Error Of Law**

The ALJ's administrative determination that Mr. Loza did not have any mental impairment related disabilities was made at step two on the grounds that his mental impairment was not severe. The ALJ adverted only to the literal terms of 20 C.F.R. § 404.1520(c) as setting forth the criteria for that determination:

> The second step in the evaluation process is a determination as to whether the claimant has an impairment or combination of impairments which is 'severe.' A severe impairment is defined in the Regulations as one which significantly limits an individual's physical or mental ability to meet the basic demands of work activity. 20 C.F.R. § 404.1520(c).

The ALJ based his conclusion that Mr. Loza's mental impairment was non-severe on his finding that "between April 27, 1979 and June 30, 1980,...the claimant [was] at most, slightly restricted by his mental impairment in his activities of daily living." Thus, the ALJ did not apply the correct standard as set forth in *Stone*, which held that an impairment can be considered as not severe only if it is a slight abnormality having such minimal effect on an individual that it would not be expected to interfere with the individual's

---

formulate a formal, precedent making definition of the term "severe impairment." Even if Justice O'Connor did so intend, we do not believe that she intended to formulate a definition that differed in its application from our definition in Stone; Justice O'Connor cited a progenitor of *Stone--Estran v. Heckler*, 745 F.2d 340, 341 (5th Cir. 1984)--as authority for her definition of severe impairment.

32

ability to *work*, irrespective of age, education or work experience. The ALJ erroneously applied his own standard involving a slight restriction in "activities of daily living" instead of this court's standard based on a slight abnormality having such minimal effect as would not be expected to interfere with "ability to work, irrespective of age, education or work experience." *Stone*, 752 F.2d at 1101; *see also Brown v. Bowen*, 864 F.2d 336, 337 (5th Cir. 1988); *Hampton v. Bowen*, 785 F.2d 1308, 1311 (5th Cir. 1986); *Sewell v. Heckler*, 764 F.2d 291, 294 (5th Cir. 1985); *Martin v. Heckler*, 748 F.2d 1027, 1032-34 (5th Cir. 1984).

The ALJ did not set forth the standard as it was construed in *Stone*, refer to *Stone* or another decision of this court to the same effect, or expressly state that the construction this court gives to 20 C.F.R. § 404.1520(c) was used. Consequently, in accordance with our holding in *Stone*, we must assume that the ALJ and Appeals Council applied an incorrect standard to the severity requirement, reverse the magistrate's judgment dismissing Mr. Loza's claim, and cause the case to be remanded to the Commissioner for reconsideration.

### C. The ALJ's Finding That Mr. Loza's Mental Impairment Is Non-Severe Or Insignificant Is Not Supported By Substantial Evidence Based On The Record As A Whole

The inquiry here is whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the

33

conclusions reached by the ALJ. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Randall v. Sullivan*, 956 F.2d 105, 109 (5th Cir. 1992); *Rivas*, 475 F.2d at 257-58; *Ward v. Celebrezze*, 311 F.2d 115, 116 (5th Cir. 1963). Written reports by physicians who have examined the claimant setting forth medical data are admissible in evidence in a disability hearing and may constitute evidence supportive of findings by hearing examiners. *See Perales*, 402 U.S. at 402. "Medically acceptable evidence includes observations made by a physician during physical examination and is not limited to the narrow strictures of laboratory findings or test results." *Ivy*, 898 F.2d at 1048-49. Medical evidence must support a physician's diagnosis, but if it does "[t]he expert opinion[] of a treating physician as to the existence of a disability [is] binding on the fact-finder unless contradicted by substantial evidence to the contrary." *Bastien v. Califano*, 572 F.2d 908, 912 (2d Cir. 1978); *see also* 20 C.F.R. § 404.1527(d)(2). "Evidence" includes medical history, statements of the claimant, decisions by any governmental or non-governmental agency, and findings made by the administrative law judge levels. *See* 20 C.F.R. § 404.1512(b)(1)-(6). However, the determinations of other agencies, while persuasive, do not bind the Social Security Administration. *See* 20 C.F.R. § 404.1504. "[E]stablished policy provides that information may be obtained from family members, friends, and former employers

34

regarding the course of the claimant's condition." *Ivy*, 898 F.2d at 1049. "[N]oncontemporaneous medical records are relevant to the determination of whether onset occurred on the date alleged by the claimant." *Id.* (citing *Basinger v. Heckler*, 725 F.2d 1166 (8th Cir. 1984); Soc.Sec.R. 83-20, 1983 CE 109).

In determining whether a claimant's physical or mental impairments are of a sufficient medical severity as could be the basis of eligibility under the law, the ALJ is required to consider the combined effects of all impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. *See* 20 C.F.R. § 404.1523; *Crowley v. Apfel*, 197 F.3d 194, 197 (5th Cir. 1999); *Anthony*, 954 F.2d at 293; *Sewell*, 764 F.2d at 294; *Davis*, 748 F.2d at 296; *Estran*, 745 F.2d at 341. If the ALJ finds a medically severe combination of impairments, "the combined impact of the impairments will be considered throughout the disability determination process." 20 C.F.R. § 404.1523. Finally, it is clear that the ALJ must consider all the record evidence and cannot "pick and choose" only the evidence that supports his position. *See Switzer v. Heckler,* 742 F.2d 382, 385-86 (7th Cir. 1984); *Garfield v. Schweiker*, 732 F.2d 605, 609 (7th Cir. 1984); *Green v. Shalala,* 852 F.Supp. 558, 568 (N.D. Tex. 1994); *Armstrong v. Sullivan,* 814 F.Supp. 1364, 1373 (W.D. Tex. 1993).

A claimant is eligible for benefits only if the onset of the qualifying medical impairment [or combination of impairments] began on or before the date the claimant was last insured. *See Ivy*, 898 F.2d at 1048 (citing POMS § KI 25501.050(B)(1)). "Claimants bear the burden of establishing a disabling condition before the expiration of their insured status." *Id.* (citing *Milam v. Bowen*, 782 F.2d 1284 (5th Cir. 1986)). Factors relevant to the determination of the date of disability include the individual's declaration of the date of when the disability began, work history and available medical history. *See id.* (citing Soc.Sec.R. 83-20, 1983 CE 109)). The claimant's stated onset date of disability is to be used as the established date when it is consistent with available medical evidence and may be rejected only if reasons are articulated and the reasons given are supported by substantial evidence. *See Spellman*, 1 F.3d at 361; *Ivy,* 898 F.2d at 1048.

The ALJ found that Mr. Loza had been diagnosed with a nonpsychotic brain syndrome due to trauma in April 1974; that a hospital summary report stated that he required follow-up treatment; that he was considered competent to handle funds due him, and a 90 day convalescence was recommended; that he received no further treatment for his mental impairment until October 1980; that there was no record of ongoing medical treatment or therapy for anxiety between April 27, 1979 and June 30, 1980; and that the claimant had recurrent and intrusive recollections of a traumatic

36

experience which were a source of marked distress. From these findings, the ALJ inferred that between April 27, 1979 and June 30, 1980 the claimant suffered from an anxiety related disorder by which he was "at most, slightly restricted...in his activities of daily living." The ALJ concluded: "Considering all the evidence, the undersigned finds the claimant's mental impairment to be a non-severe impairment."

The ALJ's determination that Mr. Loza's mental impairment was non-severe is not supported by substantial evidence because, first, the ALJ did not consider whether the combined effects of all impairments, mental and physical, would be of sufficient severity. *See* C.F.R. §§ 404.1520(a), 404.1523; *Crowley*, 197 F.3d at 197; *Anthony*, 954 F.2d at 293; *Sewell*, 764 F.2d at 294; *Davis*, 748 F.2d at 296; *Estran*, 745 F.2d at 341; second, the ALJ did not take into account: (1) the VA's determination that Mr. Loza had a service connected 100 percent disability rating prior to and during the relevant period of April 27, 1979 through June 30, 1980; (2) Dr. Reveley's determination on April 25, 1974 that Mr. Loza "cannot return to full employment[,]" which has not been changed by Dr. Reveley or any other physician; (3) the consistent diagnosis and treatment of Mr. Loza's mental impairment as Organic Brain Syndrome, Chronic Brain Syndrome, or Post Traumatic Stress Disorder by several VA treating physicians from 1974, during the relevant period, and up to the date of the ALJ hearing; (4) the VA treating

37

physicians' regular prescription of powerful antipsychotic and antidepressant drugs for Mr. Loza's mental impairment that began in 1974 and continued through the relevant period and the date of the ALJ hearing; (5) the overwhelming evidence of Mr. Loza's inability to maintain social interactions and other pertinent evidence of combined mental and physical impairments contained in Mr. Loza's medical records.

### (1) Veterans' Administration Determination

In 1973 or 1974, the Veterans' Administration determined that Mr. Loza was 100 percent permanently disabled in connection with military service as the result of his Vietnam War combat wounds and experiences. A VA rating of 100 percent service connected disability is not legally binding on the Commissioner, but it is evidence that is entitled to great weight and should not have been disregarded by the ALJ. *See Latham v. Shalala,* 36 F.3d 482, 483 (5th Cir. 1994); *Rodriguez v. Schweiker*, 640 F.2d 682, 686 (5th Cir. 1981); *Epps v. Harris*, 624 F.2d 1267, 1274 (5th Cir. 1980); *DePaepe v. Richardson*, 464 F.2d 92, 101 (5th Cir. 1972). The record demonstrates that the VA 100 percent disability rating had not changed at the time of the ALJ hearing and was in effect between April 27, 1979 and June 30, 1980. In *Rodriguez*, 640 F.2d at 686, this court stated that "[a]lthough the ALJ mentioned the Veteran's Administration disability rating on Rodriguez, he obviously refused

to give it much weight....A VA rating of 100% disability should have been more closely scrutinized by the ALJ." In the present case, the ALJ did not mention or scrutinize Mr. Loza's VA rating of 100 percent disability.

### (2) Determinations of Treating Physicians

On April 25, 1974, when Mr. Loza was transferred from the VA hospital psychiatric ward to VA therapy, Dr. Reveley, his treating physician, specifically determined that Mr. Loza "cannot return to full employment." In addition to Dr. Reveley, Dr. Gaylord, Dr. Flore, Dr. Cooney and Dr. Michals diagnosed Mr. Loza as having OBS and treated him for this condition from April 1974 through the date of the ALJ hearing. There is no evidence that Dr. Reveley or any of the other treating physicians have ever changed the diagnosis of Mr. Loza's medical conditions, his inability to work or his 100 percent service connected permanent disability status.

"This court has repeatedly held that ordinarily the opinions, diagnoses and medical evidence of a treating physician who is familiar with the claimant's injuries, treatment, and responses should be accorded considerable weight in determining disability." *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985) (citing *Barajas v. Heckler*, 738 F.2d 641, 644 (5th Cir. 1984); *Smith v. Schweiker*, 646 F.2d 1075, 1081 (5th Cir. 1981); *Perez v. Schweiker*, 653 F.2d 997, 1001 (5th Cir. 1981); *Fruge v. Harris*, 631 F.2d 1244, 1246 (5th Cir. 1980)). "The ALJ may give less weight to a treating

39

physician's opinion when 'there is good cause shown to the contrary[.]'" *Scott*, 770 F.2d at 485 (citing *Perez*, 653 F.2d at 1001; *Smith*, 646 F.2d at 1081; *Fruge,* 631 F.2d at 1246); *accord Newton v. Apfel,* 209 F.3d 448, 455-56 (5th Cir. 2000); *Leggett v. Chater,* 67 F.3d 558, 566 (5th Cir. 1995); *Greenspan*, 38 F.3d at 237; *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990).

In his opinion, the ALJ did not consider Dr. Reveley's determination on April 25, 1974 that Mr. Loza could not return to full employment. Similarly, the ALJ did not advert to the treating physicians' continuing diagnoses of OBS and PTSD and treatment of Mr. Loza for those conditions before, during and after his period of eligibility. No good cause appears in the ALJ opinion or in the record to justify the ALJ's failure to give "considerable weight" to the treating doctors' medical evidence. *See Scott*, 770 F.2d at 485. The ALJ cannot reject a medical opinion without an explanation. *See Strickland v. Harris*, 615 F.2d 1103, 1110 (5th Cir. 1980); *Goodley v. Harris*, 608 F.2d 234, 236 (5th Cir. 1979). The ALJ is not at liberty to make a medical judgment regarding the ability or disability of a claimant to engage in gainful activity, where such inference is not warranted by clinical findings. *See Spencer v. Schweiker*, 678 F.2d 42, 45 (5th Cir. 1982). Consequently, the ALJ and the Commissioner committed reversible error by failing to accord "great weight" to the medical reports of

the treating physicians. *See Fraga v. Bowen*, 810 F.2d 1296, 1304 n.8 (5ᵗʰ Cir. 1987); *Fruge*, 631 F.2d at 1246.

## (3) Prospective And Retrospective Effects
## Of Diagnoses Of Conditions

Further, "[o]nce evidence has been presented which supports a finding that a given condition exists it is presumed in the absence of proof to the contrary that the condition has remained unchanged." *Rivas*, 475 F.2d at 258 (citing *Hall v. Celebrezze*, 314 F.2d 686, 688 (6ᵗʰ Cir. 1963)); *Byerly v. Heckler*, 744 F.2d 1143, 1144 (5ᵗʰ Cir. 1984); *Taylor v. Heckler*, 742 F.2d 253, 254 (5ᵗʰ Cir. 1984); *Richardson v. Heckler*, 750 F.2d 506, 509 (6ᵗʰ Cir. 1984)(medical evidence of Korean War related PTSD available in 1953 supported a finding of disability and presumption of its continuance which the Secretary failed to overcome with evidence of improvement in claimant's condition); *Dotson v. Schweiker*, 719 F.2d 80, 82 (4ᵗʰ Cir. 1983); *Kuzmin v. Schweiker*, 714 F.2d 1233, 1237 (3d Cir. 1983); *Schauer v. Schweiker*, 675 F.2d 55, 59 n.4 (2d Cir. 1982); *accord Prevette v. Richardson*, 316 F.Supp. 144, 146 (D.S.C. 1970). The record as a whole shows no genuine improvement in Mr. Loza's mental and physical impairments. The ALJ's findings suggesting the contrary are not supported by substantial evidence on the record as a whole for the reasons already stated and those to be given later.

41

On the other hand,"'[s]ubsequent medical evidence is [also] relevant...because it may bear upon the severity of the claimant's condition before the expiration of his or her insured status.'" *Ivy*, 898 F.2d at 1049 (citing *Basinger*, 725 F.2d at 1169; *Parsons v. Heckler*, 739 F.2d 1334 (8th Cir. 1984)). Retrospective medical diagnoses of PTSD, even if uncorroborated by contemporaneous medical reports but corroborated by lay evidence relating back to the claimed periods of disability, can support a finding of past impairment. *See Likes v. Callahan*, 112 F.3d 189, 190 (5th Cir. 1997)("'PTSD is an unstable condition that may not manifest itself until well after the stressful event which caused it, and may wax and wane after manifestation.'" *Id.* at 191 (quoting and adopting the rule of *Jones v. Chater*, 65 F.3d 102, 103 (8th Cir. 1995)). In addition to the primary medical evidence, the record contains reports by family members, therapists and counselors of Mr. Loza's hallucinations, social withdrawal and other symptoms of PTSD and OBS before and after his insured status had lapsed. The ALJ's failure to recognize the existence and significance of this cogent evidence further demonstrates that the administrative determination is not supported by substantial evidence on the record as a whole.

### (4) Antipsychotic and Antidepressant Medications

The ALJ did not take into account the evidence concerning the nature and quantity of medications that Mr. Loza's treating

physicians prescribed for his mental impairment and disability before, during and after the period in question. The ALJ neither elicited testimony nor made any findings regarding the timing, purpose or effect of the antipsychotic drugs and other medicines that were prescribed for Mr. Loza between 1974 and the date of the ALJ hearing. Mr. Loza was placed on Haldol[20] by Dr. Reveley during his April 1974 confinement at the Olin R. Teague Center. On November 22, 1974, February 7, 1975 and June 26, 1975 Dr. Reveley prescribed Darvon[21] and Haldol. Dr. Johnson prescribed acetaminophen[22] on April 8, 1977. A medical doctor whose name is not clear from the record prescribed Haldol and Ascriptin[23] on July 23, 1978 and September 17, 1979. On April 7, 1980, October 8, 1980, and February 10, 1981, Dr. Flore, M.D., prescribed Ascriptin, Stelazine[24] and Benadryl[25]. Stelazine was prescribed by Dr. Flore on August 28, 1981, and he prescribed Stelazine and Ascriptin on December 23, 1981. On June 28, 1982, Mr. Loza was taken off Stelazine by Dr. Lipt and placed on Ascriptin and

---

[20]See *supra* note 5.

[21]See *supra* note 6.

[22]See *supra* note 7.

[23]See *supra* note 9.

[24]See *supra* note 10.

[25]See *supra* note 11.

Vistaril[26].  Dr. Lipt prescribed Vistaril on September 22, 1982, and both Vistaril and Ascriptin on December 16, 1982, June 22, 1983, December 14, 1983, June 1, 1984, September 4, 1984, February 5, 1985, August 20, 1985, March 13, 1986 and September 22, 1986.  On March 3, 1987 Dr. Lipt prescribed only Vistaril for Mr. Loza.  Dr. Gaylord prescribed Allopurinol[27] on June 22, 1987, presumably to lower the uric acid levels in the claimant's blood.  Mr. Loza received Motrin and Tylenol from Dr. Gaylord, and Vistaril from Dr. Lipt on September 1, 1987.  A medical doctor with an illegible signature prescribed Vistaril on March 1, 1988.  Dr. McCormick refilled Mr. Loza's Hydroxyzine (presumably Stelazine) prescription on August 30, 1989 to help the claimant rest.  However, Dr. McCormick canceled the Hydroxyzine prescription on November 13, 1989 and prescribed Ibuprofen and Diphenhydramine[28] (the antihistamine present in Benadryl).  Dr. McCormick issued another prescription for Ibuprofen and Diphenhydramine on August 8, 1990.  After a Motrin prescription from a medical doctor with an illegible signature on March 4, 1992, Mr. Loza was placed on Nortriptyline[29]

---

[26]See *supra* note 12.

[27]See *supra* note 13.

[28]Diphenhydramine is an antihistamine sometimes used as a nighttime sleep aid for the short-term management of insomnia.  *See* American Hospital Formulary Service Drug Information 2000, at 25-29.

[29]See *supra* note 14.

by another doctor on November 23, 1992. Dr. Michals prescribed Nortriptyline on December 28, 1992 and subsequently canceled the prescription on February 19, 1993. On October 29, 1993 Dr. Michals started Mr. Loza on Sertraline.[30] An unidentified medical doctor prescribed Verapamil to control blood pressure on November 22, 1993, March 2, 1994 and September 30, 1994. Sertraline dosage was decreased by Dr. Michals on November 30, 1993 but returned to earlier levels at Mr. Loza's request on December 30, 1993.

The history of Mr. Loza's extensive medical treatment with antipsychotic and other mood altering medications not only indicates the presence of a disabling mental illness but also the possibility of medication side effects that could render a claimant disabled or at least contribute to a disability. *See Cowart v. Schweiker*, 662 F.2d 731, 737 (11th Cir. 1981)(citing 20 C.F.R. Pt. 404, Subpart P, App. 1, § 11.00 (1981); *Figueroa v. Secretary of HEW*, 585 F.2d 551 (1st Cir. 1978)). The lack of consideration of the antipsychotics, antidepressants, and other medications administered to Mr. Loza before, during and after the period of April 27, 1979 to June 30, 1980 as evidence of mental impairment and disability further demonstrates that the ALJ's findings of fact are not substantially supported by the record when viewed as a whole.

---

[30]See *supra* note 15.

## (5) ALJ's Findings Contrary to Overwhelming Evidence of Mr. Loza's Inability to Maintain Social Functioning; Disregard of Other Pertinent Evidence in Medical Record

The ALJ found that "[T]he claimant's ability to maintain social functioning was only slightly limited by his mental impairment....There is nothing in the medical record to suggest that the claimant was socially inhibited by his mental impairment." The ALJ's finding is fundamentally at odds with the evidence. Dr. Reveley on April 9, 1974 noted Mr. Loza's "phobic trends" and his refusal to enter a theater with other people present. Dr. Reveley also recognized Mr. Loza's "adjustment reaction of adult life with marital conflicts." Moreover, Mr. Loza's testimony before the ALJ reveals his social impoverishment: "I can't be around -- I get nervous around a lot of people. For a long time I couldn't even go into a movie theater because I couldn't have nobody sitting behind me." Mr. Loza's former wife Janie in her letter also describes his paranoia and fear of crowds. After years of marital problems, she divorced him in 1990. On June 28, 1982 Mr. Loza confided to Dr. Cooney his suicide attempt after an argument with his wife. An August 9, 1989 medical report completed by Dr. McCord makes reference to the misbehavior of Mr. Loza's daughter and his dysfunctional relationship with her. Finally, on February 26, 1993, Mr. Loza admitted striking his son the previous evening.

Doctors observed that Mr. Loza appeared unwilling or unable to participate in group therapy from 1982 to 1983, and, consequently,

46

he was removed to individual therapy. On November 23, 1992, Dr. George Clay commented that Mr. Loza "tends to isolate." Mr. Loza testified that he only has one friend, his neighbor. In a disability report he filled out for the SSA, he described his "social contacts" as one friend he fished with and his mother. The available medical records show he has two brothers and seven sisters in south Texas. Yet the evidence indicates that Mr. Loza has withdrawn from a social relationship with them.

The ALJ also did not indicate that he had given consideration to Mr. Loza's tinnitus, hearing loss, inability to concentrate, abdominal wall impairment, lumbosacral strain, hallucinations, and other mental and physical impairment symptoms.

### (6) Summary

The ALJ found that between April 27, 1979 and June 30, 1980, Mr. Loza was "at most, slightly restricted by his mental impairment in his activities of daily living." In making this determination the ALJ did not consider the totality of the evidence relevant to Mr. Loza's mental and physical impairments, including the VA determination of 100 percent disability; Dr. Reveley's determination that Mr. Loza could not return to full employment; the repeated diagnoses of Mr. Loza's PTSD and OBS; the prospective and retrospective significance of determinations by treating physicians and therapists of Mr. Loza's PTSD and OBS; the nature and quantity of the treating physicians' administration of

47

antipsychotics, antidepressants, and other medications; and the claimant's wounded and weakened abdominal wall and back, back pain, acute back sprain, headaches, depression, hallucinations, nightmares, insomnia, tinnitus, hearing loss, memory loss, concentration loss, difficulties in anger management and social isolation. Consequently, the record viewed as a whole does not contain substantial evidence supporting an administrative determination that the combination of Mr. Loza's mental and physical impairments did not exceed the level of "a slight abnormality [having] such minimal effect...that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *Stone*, 752 F.2d at 1101 (internal quotes and citations omitted).

### D. The ALJ's Use of the Medical-Vocational Guidelines Was Improper And Must Be Reconsidered

After considering Mr. Loza's physical impairments, the ALJ concluded that "[b]ased on exertional capacity for medium work, and the claimant's age, education and work experience, Section 404.1569 and Rule 203.28, Appendix 2, Subpart P, Regulations No. 4, directs a conclusion of 'not disabled'". However, based on the record as a whole, it cannot be said that the ALJ's reliance solely on the Medical-Vocational Guidelines at the fifth level in this case was a correct application of the proper legal standards. "Use of the 'Grid Rules' is appropriate when it is established that a claimant

48

suffers only from exertional impairments, or that the claimant's nonexertional impairments do not significantly affect his residual functional capacity." *Crowley*, 197 F.3d at 199. Moreover, the Secretary bears the burden at the fifth step of establishing that the claimant is capable of performing work in the national economy. *See Leggett*, 67 F.3d at 565 n.11; *Greenspan*, 38 F.3d at 236.

We have determined that the ALJ's finding that Mr. Loza's mental impairment was non-severe was not reached through the application of the proper legal standard and was not supported by substantial evidence on the record. Accordingly, if it should be determined on remand that Mr. Loza's non-exertional mental impairments during the period of disability were not merely a slight abnormality of minimal effect on ability to work, the ALJ's reliance on the Grid Rules at the fifth level also constitutes error and must be reconsidered. *See Newton,* 209 F.3d at 458; *Crowley,* 197 F.3d at 199; *Fraga*, 810 F.2d at 1304; *Dellolio v. Heckler*, 705 F.2d 123, 127-28 (5th Cir. 1983); *Thomas v. Schweiker*, 666 F.2d 999, 1004 (5th Cir. 1982).

**E. Failure to Employ Proper Legal Standards By Not Considering the Combined Effects of Impairments**

The ALJ erred by separately evaluating the consequence of Mr. Loza's mental and physical impairments and by not considering their combined effects. The law of this Circuit requires consideration of the combined effect of impairments: "The well-settled rule in

this Circuit is that in making a determination as to disability, the ALJ must analyze both the 'disabling effect of each of the claimant's ailments' and the 'combined effect of all of these impairments.'" *Fraga*, 810 F.2d at 1305 (citing *Dellolio*, 705 F.2d at 128).

The ALJ's disposition of the present case bears a strong resemblance to the situation encountered by this court in *Strickland v. Harris*:

> The ALJ failed to address at all a fact issue raised herein which was essential to a conclusion of no disability, namely, the degree of impairment caused by the *combination* of physical and mental medical problems. *Dodsworth v. Celebrezze*, 349 F.2d 312 (5th Cir. 1965). The ALJ addressed certain of the claimant's complaints separately, tending to minimize them (sometimes despite quite strong evidence to the contrary, *see* note 4 *supra*), but he devoted no discussion and made no factfindings as to disability indicated as arising from the interaction or cumulation of even those medical problems whose existence he acknowledged or did not rule out.

*Strickland,* 615 F.2d at 1110; *see also, e.g., Scott*, 770 F.2d at 487 ("Although the ALJ stated that he had 'carefully considered the entire record in this case,' his 'evaluation of the evidence' addresses each impairment separately and does not specifically discuss the interaction or cumulation of all of the claimant's medical problems."). Thus, the interaction or cumulation of all of Mr. Loza's mental and physical medical problems and impairments also must be addressed on remand.

## IV. CONCLUSION

For the aforementioned reasons, we REVERSE the district court's judgment affirming the Commissioner's decision, and REMAND the case to the district court with instructions to vacate the Commissioner's decision and remand the case to the Commissioner for further consideration and proceedings in accordance with this opinion.