**Vernon Denise ROBINSON, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of the Social Security Administration, Defendant.**

No. CIV.A.H–02–1369.

United States District Court, S.D. Texas.

Jan. 31, 2003.

---

9. Berger amended that complaint once before  on April 24, 2002.

Victor N Makris, Attorney at Law, Bellaire, TX, for Plaintiff.

Joseph B Liken, Commissioner of The Social Security Administration, OGC Social Sec., Dallas, TX, for Defendant.

## MEMORANDUM AND ORDER

CRONE, United States Magistrate Judge.

Pending before the court are Plaintiff Vernon D. Robinson's ("Robinson") and Defendant Jo Anne B. Barnhart's ("Barnhart" or "the Commissioner") cross-motions for summary judgment. Robinson appeals Administrative Law Judge Harry L. Williams, Jr.'s ("the ALJ" or "Judge Williams"), determination that she is not entitled to receive Title XVI supplemental security income ("SSI") benefits. *See* 42 U.S.C. § 1382c(a)(3)(A). Having reviewed the pending motions, the submissions of the parties, the pleadings, the administrative record, and the applicable law, the court is of the opinion that Barnhart's Motion for Summary Judgment (# 13) should be denied, Robinson's Motion for Summary Judgment (# 12) should be granted in part, the ALJ's decision denying benefits should be reversed, and the case should be remanded to the Social Security Administration ("SSA") for further proceedings consistent with this opinion.

## I. *Background*

Robinson alleges that she is disabled due to cerebral palsy,[1] a hole in her heart, shortness of breath, and bone marrow disease, as well as depression[2] and mental retardation.[3] Robinson, who was born in 1966, has never held a job. On March 30, 1999, Robinson protectively filed an application for SSI benefits with the SSA, claiming that she has been disabled and unable to work since November 11, 1997. On August 24, 1999, she filed a supplemental application for SSI benefits. The SSA denied her claim initially on January 5, 2000, and again on reconsideration on April 10, 2000. On April 13, 2000, Robinson requested an administrative hearing before an ALJ to reconsider the decision.

A hearing was held on July 20, 2001, in Houston, Texas, before Judge Williams at which time he heard testimony from Robinson, who was represented by attorney Michelle Lerandeau–Freeman, and received in evidence numerous medical records pertaining to her condition. Cheryl Swisher, a vocational rehabilitation counselor, was present at the hearing but did not testify. No medical expert was called to testify at the hearing, as the ALJ appeared to consider such testimony premature in light of "so much conflicting evidence" and "too much inconsistent tests." The ALJ indicated that after additional tests were performed, he was planning on conducting a supplemental hearing at which a neurologist would be called to testify. He admonished Robinson, however, that if he got the impression that she

---

1. "Cerebral palsy" is a "group of persisting, nonprogressive motor disorders appearing in young children and resulting from brain damage caused by birth trauma . . . ." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1217 (28th ed.1994). They are characterized by delayed or abnormal motor development which is often accompanied by mental retardation and seizures. *See id.*

2. "Depression" is a "mental state of depressed mood characterized by feelings of sadness, despair, and discouragement. Depression ranges from normal feelings of 'the blues' through dysthymia to major depression. It in many ways resembles the grief

and mourning that follow bereavement; there are often feelings of low self-esteem, guilt, and self-reproach, withdrawal from interpersonal contact, and somatic symptoms such as eating and sleep disturbances." DORLAND'S, *supra*, at 445.

3. "Mental retardation" is "a mental disorder characterized by significantly subaverage general intellectual functioning associated with impairments in adaptive behavior and manifested during the developmental period." DORLAND'S, *supra*, at 1450. Mental retardation classified as "mild" is represented by an IQ score of 50–70. *See id.*

was not helping him on these tests, he was "not going to be helpful to [her]." The ALJ ordered a post-hearing psychological consultative exam with IQ[4] testing and a vocational report with a functional capacity evaluation, but he never convened another hearing.

On August 22 and 23, 2001, Wayne Gray Alfred, CPC, LPC ("Alfred"), a vocational evaluator, performed a consultative examination of Robinson. Alfred completed a work evaluation report concerning Robinson's physical capacity to perform work-related activities, opining that she demonstrated the ability to lift and carry a 20 to 30 pound box and that "she appeared to have the physical capacity to perform at least light work." Alfred also observed no difficulties with Robinson's "sitting, standing, walking, bending, crouching, squatting, kneeling, reaching, or handling/fingering." He concluded that "[h]er physical capacity did not correspond with those of a person with cerebral palsy." Alfred, however, described her performance as characteristic of a person with mental retardation. According to Alfred, Robinson was "unable to maintain instructions or perform work without continual supervision." He further reported that she was "unable to recognize work errors, had little or no understanding of work procedures, and had no understanding of the meaning or value of work." Additionally, he noted her "work pace was slow and haphazard."

In a psychological evaluation dated August 24, 2001, J.L. Paterson, Ph.D. ("Dr.Paterson"), a psychologist and consultative examiner, diagnosed Robinson with "Depressive disorder NOS" and "Probable . . . Borderline intellectual functioning."

He noted that Robinson's "affect seemed depressed during the exam," commenting that she "appear[ed] generally physically healthy but depressed." Dr. Paterson observed memory deficiencies, computation difficulties, and deficiencies in general knowledge and abstract thinking, ultimately concluding that Robinson's intellectual functioning "appears to be in the borderline to deficient range." He determined that Robinson had no useful ability to understand, remember, and carry out complex job instructions. Dr. Paterson further assessed Robinson's performance as "Poor" in the following categories: (1) ability to deal with work stress; (2) ability to behave in an emotionally stable manner; and (3) ability to understand, remember, and carry out detailed but not complex job instructions. An assessment of "Poor" denotes an individual's "[a]bility to function in this area is almost absent."

In a decision dated November 1, 2001, the ALJ denied Robinson's application for benefits, concluding that she was not disabled within the meaning of the Social Security Act ("the Act"). The ALJ found that the medical evidence indicated that Robinson had a deformed foot, high blood pressure, and depression. He determined that because the combined effects of these impairments imposed significant limitations on her ability to perform work-related activities, she had a "severe impairment" within the meaning of the regulations. *See* 20 C.F.R. § 416.924(c). The ALJ further found that Robinson had "the residual functional capacity to perform a significant range of light work in the unskilled job base" and, therefore, was not disabled as defined under the Act. *See* 20 C.F.R. § 416.967. The ALJ's

---

4. An "intelligence quotient" or IQ is "[a] numerical rating used to designate a person's intelligence; a ratio of an individual's performance on some standardized mental test as compared to the normal or average for age and even social situation." GOULD MEDICAL DICTIONARY 683 (4th ed.1979). Mental deficiency is defined as an IQ of 69 or lower. *See id.*

findings regarding Robinson's residual functional capacity ("RFC") were based in large part on Alfred's assessment as well as a 1998 report prepared by J. Robert Yohman, Ph.D. ("Dr.Yohman"), a neuropsychologist and consultative examiner. Dr. Yohman characterized Robinson as "produc[ing] a profile typical of malingerers," likely due to "conscious feigning or exaggeration of pathology in order to gain some external incentive (e.g., disability income)." The ALJ also took into account Robinson's testimony at the hearing, which he summarized, as follows:

> At the hearing, the claimant testified that she cleans, cooks and takes care of her children on a daily basis. She reads the Bible and watches some TV. She does not drive but takes the bus or gets a ride in order to do the grocery shopping. She testified that she has difficulty sleeping—she is up until 4 a.m. and that she stays depressed. She walks to her doctor's office, which is one mile away. She stated that sitting makes her back hurt and that she was able to move a sofa and a table.

On March 26, 2002, Robinson appealed the ALJ's decision to the Appeals Council of the SSA's Office of Hearings and Appeals. On April 2, 2002, the Appeals Council declined to review the ALJ's determination, rendering his opinion the final decision of the Commissioner. *See Sims v. Apfel,* 530 U.S. 103, 107, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000). Robinson filed the instant action on April 8, 2002, contesting the Commissioner's denial of her claim for benefits.

## II. *Analysis*

### A. *Statutory Bases for Benefits*

SSI benefits are authorized by Title XVI of the Act and are funded by general tax revenues. *See Nobles v. Commissioner of Soc. Sec. Admin.,* No. 9:00–CV–128, 2002 WL 553735, at *1 (E.D.Tex. Apr.10, 2002) (citing Social Security Administration, Social Security Handbook, § 2100 (14th ed.2001)). "The SSI Program is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line." *Id.; see* 20 C.F.R. § 416.110. "Eligibility for SSI is based upon proof of *indigence* and *disability.*" *Nobles,* 2002 WL 553735, at *1 (emphasis in original) (citing H.R.Rep. No. 92–231 (1972), reprinted in 1972 U.S.C.C.A.N. 4989, 5132–5133; 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C)). A claimant applying to the SSI program cannot receive payment for any period of disability predating the month in which she applies for benefits, no matter how long she has actually been disabled. *See Brown v. Apfel,* 192 F.3d 492, 495 n. 1 (5th Cir.1999) (citing 20 C.F.R. § 416.335); *Torres v. Chater,* 125 F.3d 166, 171 n. 1 (3d Cir.1997); *Perkins v. Chater,* 107 F.3d 1290, 1295 (7th Cir.1997); *Kepler v. Chater,* 68 F.3d 387, 389 (10th Cir.1995). The applicable regulation provides:

> When you file an application in the month that you meet all the other requirements for eligibility, the earliest month for which we can pay you benefits is the month following the month you filed the application. If you file an application after the month you first meet all the other requirements for eligibility, we cannot pay you for the month in which your application is filed or any months before that month.

20 C.F.R. § 416.335. Hence, the month following an application, here, April 1999, fixes the earliest date from which benefits can be paid. Eligibility for SSI payments, however, is not dependent on insured status. *See* 42 U.S.C. § 1382(a).

Social Security disability insurance benefits are authorized by Title II of the Act and are funded by Social Security taxes.

*See Nobles,* 2002 WL 553735, at *1 n. 2 (citing SOCIAL SECURITY HANDBOOK, § 2100). The disability insurance program "provides income to individuals who are forced into involuntary, premature retirement, provided they are both *insured* and *disabled,* regardless of indigence." *Id.* (emphasis in original) (citing 42 U.S.C. § 423(a); *Mathews v. de Castro,* 429 U.S. 181, 186, 97 S.Ct. 431, 50 L.Ed.2d 389 (1976)). A claimant for disability insurance can collect benefits for up to twelve months of disability prior to the filing of an application. *See Perkins,* 107 F.3d at 1295 (citing 20 C.F.R. §§ 404.131, 404.315). To be eligible for disability insurance benefits under Title II, an individual must be insured for such benefits. *See* 42 U.S.C. § 423(a)(1)(A). Because Robinson has never been employed and apparently has never been married to a wage earner, she is not eligible to receive benefits under Title II of the Act. *See id.; see also Schweiker v. Hogan,* 457 U.S. 569, 585, 102 S.Ct. 2597, 73 L.Ed.2d 227 (1982); *Fontana v. Callahan,* 999 F.Supp. 304, 308 (E.D.N.Y.1998).

While these are separate and distinct programs, applicants seeking benefits under either statutory provision must prove "disability" within the meaning of the Act, which defines disability in virtually identical language for both programs. *See Nobles,* 2002 WL 553735, at *1 (citing 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a)). Under both provisions, disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Moreover, "[t]he law and regulations governing the determination of disability are the same for both disability

insurance benefits and SSI." *Greenspan v. Shalala,* 38 F.3d 232, 236 (5th Cir.1994), *cert. denied,* 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995).

## B. *Standard of Review*

Federal courts review the Commissioner's denial of disability benefits only to ascertain whether the final decision is supported by substantial evidence on the record as a whole and whether the proper legal standards were applied to evaluate the evidence. *See Masterson v. Barnhart,* 309 F.3d 267, 272 (5th Cir.2002); *Watson v. Barnhart,* 288 F.3d 212, 215 (5th Cir. 2002); *Myers v. Apfel,* 238 F.3d 617, 619 (5th Cir.2001) (citing *Greenspan,* 38 F.3d at 236); *Newton v. Apfel,* 209 F.3d 448, 452 (5th Cir.2000). " 'Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion.' " *Ripley v. Chater,* 67 F.3d 552, 555 (5th Cir.1995) (quoting *Greenspan,* 38 F.3d at 236). "Substantial evidence is 'more than a mere scintilla and less than a preponderance.' " *Masterson,* 309 F.3d at 272 (quoting *Newton,* 209 F.3d at 452); *accord Watson,* 288 F.3d at 215; *Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir.2001); *Myers,* 238 F.3d at 619; *Harris v. Apfel,* 209 F.3d 413, 417 (5th Cir.2000); *Ripley,* 67 F.3d at 555; *Martinez v. Chater,* 64 F.3d 172, 173 (5th Cir.1995); *Greenspan,* 38 F.3d at 236.

On review, when applying the substantial evidence standard, the court " 'scrutinize[s] the record to determine whether such evidence is present.' " *Myers,* 238 F.3d at 619 (quoting *Greenspan,* 38 F.3d at 236 (citing *Haywood v. Sullivan,* 888 F.2d 1463, 1466 (5th Cir. 1989))); *see Leggett v. Chater,* 67 F.3d 558, 564 (5th Cir.1995); *Fraga v. Bowen,* 810 F.2d 1296, 1302 (5th Cir.1987). If the Commissioner's findings are supported by substantial evidence, they must be affirmed. *See Watson,* 288 F.3d at 215 (cit-

ing *Marcello v. Bowen*, 803 F.2d 851, 853 (5th Cir.1986) (citing *Richardson v. Perales*, 402 U.S. 389, 390, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971))); *Newton*, 209 F.3d at 452 (citing *Martinez*, 64 F.3d at 173). Conversely, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision. *See Boyd*, 239 F.3d at 704 (citing *Harris*, 209 F.3d at 417); *accord Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir.1988) (citing *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir.1983)). The court may not, however, reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *See Masterson*, 309 F.3d at 272; *Myers*, 238 F.3d at 619 (citing *Greenspan*, 38 F.3d at 236 (citing *Haywood*, 888 F.2d at 1466)). "In short, '[c]onflicts in the evidence are for the Commissioner and not the courts to resolve.'" *Masterson*, 309 F.3d at 272 (quoting *Newton*, 209 F.3d at 452); *accord Watson*, 288 F.3d at 215; *Brown*, 192 F.3d at 496.

### C. *ALJ's Determination*

An ALJ must engage in a five-step inquiry to determine whether the claimant is capable of performing "substantial gainful activity," or is, in fact, disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings. *See* 20 C.F.R. § 416.920(b).

2. An individual who does not have a "severe impairment" will not be found to be disabled. *See* 20 C.F.R. § 416.920(c).

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors. *See* 20 C.F.R. § 416.920(d).

4. If an individual is capable of performing the work [she] has done in the past, a finding of "not disabled" must be made. *See* 20 C.F.R. § 416.920(e).

5. If an individual's impairment precludes performance of [her] past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed. *See* 20 C.F.R. § 416.920(f).

*Newton*, 209 F.3d at 453; *accord Watson*, 288 F.3d at 216; *Boyd*, 239 F.3d at 705; *Myers*, 238 F.3d at 619; *Shave v. Apfel*, 238 F.3d 592, 594 (5th Cir.2001); *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir.2000); *Loza v. Apfel*, 219 F.3d 378, 390 (5th Cir. 2000). The claimant has the burden to prove disability under the first four steps, but the Commissioner bears the burden on the fifth step to show that the claimant can perform other substantial work in the national economy. *See Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 216; *Myers*, 238 F.3d at 619 (citing *Greenspan*, 38 F.3d at 236 (citing *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987))); *accord Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir.1991). If the Commissioner meets this burden, then the burden of proof returns to the claimant to rebut the Commissioner's showing by proving that she cannot, in fact, perform the alternate work suggested. *See Masterson*, 309 F.3d at 272; *Boyd*, 239 F.3d at 705 (citing *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir.1991)); *Shave*, 238 F.3d at 594 (citing *Crowley v. Apfel*, 197 F.3d 194, 198 (5th Cir.1999)); *Carey*, 230 F.3d at 135. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. *See Masterson*, 309 F.3d at 272 (citing *Greenspan*, 38 F.3d at 236); *Boyd*, 239 F.3d at 705.

The mere presence of an impairment does not necessarily establish a disability. *See Anthony v. Sullivan,* 954 F.2d 289, 293 (5th Cir.1992) (quoting *Milam v. Bowen,* 782 F.2d 1284, 1286 (5th Cir.1986)). An individual claiming disability under the Act has the burden to prove that she suffers from a disability as defined by the Act. *See Newton,* 209 F.3d at 452; *Selders v. Sullivan,* 914 F.2d at 618; *Johnson,* 864 F.2d at 344; *Cook v. Heckler,* 750 F.2d 391, 393 (5th Cir.1985). A claimant is deemed disabled under the Act only if she demonstrates an " ' "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." ' " *Shave,* 238 F.3d at 594 (quoting *Crowley,* 197 F.3d at 197–98 (quoting 42 U.S.C. § 423(d)(1)(A))); *accord* 42 U.S.C. § 1382c(a)(3)(A); *Masterson,* 309 F.3d at 271; *Newton,* 209 F.3d at 452; *Selders,* 914 F.2d at 618. "Substantial gainful activity is defined as work activity involving significant physical or mental abilities for pay or profit." *Newton,* 209 F.3d at 452–53 (citing 20 C.F.R. § 404.1572(a), (b)); *see also* 20 C.F.R. § 416.972.

A medically determinable " 'physical or mental impairment' " is " 'an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.' " *Hames,* 707 F.2d at 165 (quoting 42 U.S.C. § 423(d)(3)). To qualify for benefits, the claimant must have an impairment or combination of impairments that is "severe." *See Crowley,* 197 F.3d at 197. "An impairment or combination of impairments is 'severe' if it 'significantly limits [a claimant's] physical or mental ability to do basic work activities.' " *Id.* (quoting 20 C.F.R. § 404.1520(c)); *accord* 20 C.F.R. § 416.920(c). Hence, "an individual is 'under a disability, only if [her] impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .' " *Greenspan,* 38 F.3d at 236 (quoting 42 U.S.C. § 423(d)(2)(A)); *accord* 42 U.S.C. § 1382c(a)(3)(B). This is true regardless of whether such work exists in the immediate area in which the claimant resides, whether a specific job vacancy exists, or whether the claimant would be hired if she applied. *See Oldham v. Schweiker,* 660 F.2d 1078, 1083 (5th Cir. 1981) (citing 42 U.S.C. § 423(d)(2)(A)); *accord* 42 U.S.C. § 1382c(a)(3)(B).

When assessing a claim for disability benefits, "[i]n the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work." *Sullivan v. Zebley,* 493 U.S. 521, 525, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990) (citing 20 C.F.R. pt. 404, subpt. P, App. 1, (pt. A)); *see Yuckert,* 482 U.S. at 141, 107 S.Ct. 2287. If the claimant is not actually working and her impairment matches or is equivalent to one of the listed impairments, she is presumed to be disabled and qualifies for benefits without further inquiry. *See Zebley,* 493 U.S. at 525, 532, 110 S.Ct. 885 (citing 20 C.F.R. § 416.920(d)); *accord Yuckert,* 482 U.S. at 141, 107 S.Ct. 2287. When a claimant has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G); *see Zebley,* 493 U.S. at 536 n. 16, 110 S.Ct. 885; *Loza,* 219 F.3d at 393; *Crowley,* 197 F.3d at 197; *Davis v. Shalala,* 985 F.2d 528, 532 (11th Cir.1993); *Gibson v. Heckler,* 779 F.2d 619,

623 (11th Cir.1986). The relevant regulation similarly provides:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled.

20 C.F.R. § 416.923; *see Loza,* 219 F.3d at 393. "The ALJ must address the degree of impairment caused by the *'combination* of physical and mental medical problems.' " *Gibson,* 779 F.2d at 623 (quoting *Strickland v. Harris,* 615 F.2d 1103, 1110 (5th Cir.1980) (emphasis in original)). The medical findings of the combined impairments are compared to the listed impairment most similar to the claimant's most severe impairment. *See Zebley,* 493 U.S. at 531, 110 S.Ct. 885.

In the case at bar, when addressing the first four steps, the ALJ determined:

1. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

2. The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations (20 CFR § 416.920(b)).

3. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

5. The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR § 416.927).

As to the fifth step, the ALJ concluded:

6. The claimant has the following residual functional capacity: light range of exertion.

7. The claimant has no past relevant work (20 CFR § 416.965).

8. The claimant is a 'younger individual' (20 CFR § 416.963).

9. The claimant has a 'limited education' (20 CFR § 416.964).

10. The claimant has the residual functional capacity to perform a significant range of light work in the unskilled job base (20 CFR § 416.967).

11. On the basis of the record, the undersigned finds that medical-vocational rule 202.17 directs a conclusion that the claimant is not disabled and that there are a significant number of jobs in the national economy that the claimant can perform given her residual functional capacity as well as other vocational factors, of which administrative notice is taken. The claimant can perform work in the light range of exertion in the unskilled job base.

12. No prior application filed by the claimant is reopened by this decision.

13. The claimant was not under a "disability," as defined in the Social Security Act, at any time through

the date of this decision (20 CFR § 416.920(f)).

This court's inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ's findings and whether the proper legal standards have been applied. *See Masterson,* 309 F.3d at 272; *Watson,* 288 F.3d at 215; *Myers,* 238 F.3d at 619 (citing 42 U.S.C. §§ 405(g), 1383(c)(3)); *Newton,* 209 F.3d at 452; *Greenspan,* 38 F.3d at 236. To determine whether the decision to deny Robinson's claim for disability benefits is supported by substantial evidence, the court weighs the following four factors: (1) the objective medical facts; (2) the diagnoses and opinions from treating and examining physicians; (3) the plaintiff's subjective evidence of pain and disability, and any corroboration by family and neighbors; and (4) the plaintiff's age, educational background, and work history. *See Martinez,* 64 F.3d at 174; *Wren,* 925 F.2d at 126 (citing *DePaepe v. Richardson,* 464 F.2d 92, 94 (5th Cir.1972)). Any conflicts in the evidence are to be resolved by the ALJ and not the court. *See Newton,* 209 F.3d at 452 (citing *Brown,* 192 F.3d at 496; *Selders,* 914 F.2d at 617); *Martinez,* 64 F.3d at 174.

### D. *Issues Presented*

Robinson challenges the ALJ's decision on the following grounds: (1) the ALJ erred by failing to consult a medical expert to assess Robinson's RFC including her depression; (2) the ALJ erred by failing to give controlling weight to the opinion of Robinson's treating physician, Warren Dailey, M.D. ("Dr.Dailey"), without analyzing the factors set forth in 20 C.F.R. § 416.927 or recontacting her treating physician for clarification; (3) the ALJ erred by failing to obtain an updated assessment of the medical equivalency of Robinson's combined impairments; and (4) the ALJ erred by failing to find that Robinson met or equaled Section 12.05 of the Appendix 1 listings for mental retardation.

### 1. *Assessment of Residual Functional Capacity*

Under the Act, a person is considered disabled:

only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). If a claimant demonstrates that she cannot perform her past relevant work, the Commissioner bears the burden of proving that her functional capacity, age, education, and work experience allow her to perform work in the national economy. *See Yuckert,* 482 U.S. at 146 n. 5, 107 S.Ct. 2287; *Masterson,* 309 F.3d at 272; *Watson,* 288 F.3d at 216; *Myers,* 238 F.3d at 619; *Greenspan,* 38 F.3d at 236. Once the Commissioner fulfills this burden by pointing out potential alternative employment, the claimant, in order to prevail, must prove that she cannot perform the alternate work suggested. *See Masterson,* 309 F.3d at 272; *Boyd,* 239 F.3d at 705; *Shave,* 238 F.3d at 594; *Carey,* 230 F.3d at 135.

To determine whether an applicant can return to a former job or, if never employed, can perform substantial work in the national economy, the regulations require the ALJ to evaluate the applicant's RFC. *See Carter v. Heckler,* 712 F.2d 137, 140 (5th Cir.1983) (citing 20 C.F.R. §§ 404.1561, 416.961). "This term of art

merely designates the ability to work despite physical or mental impairments." *Id.* (citing 20 C.F.R. §§ 404.1545, 416.945). " 'Residual functional capacity' combines a medical assessment with the descriptions by physicians, the applicant or others of any limitations on the applicant's ability to work." *Id.* When a claimant's RFC is not sufficient to permit her to continue her former work, then her age, education, and work experience must be considered in evaluating whether she is capable of performing any other work. *See* 20 C.F.R. §§ 404.1561, 416.961. The testimony of a vocational expert is valuable in this regard, as " 'he [or she] is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.' " *Carey,* 230 F.3d at 145 (quoting *Fields v. Bowen,* 805 F.2d 1168, 1170 (5th Cir.1986)); *see Masterson,* 309 F.3d at 273; *Vaughan v. Shalala,* 58 F.3d 129, 132 (5th Cir.1995). In the absence of contrary evidence, the ALJ may properly rely on the testimony of a vocational expert in reaching a conclusion regarding a claimant's RFC to perform work available in the national economy. *See Masterson,* 309 F.3d at 273.

Moreover, under certain circumstances, the ALJ's application of the medical-vocational guidelines set forth in Appendix 2 of Subpart P of the regulations, also referred to as the grids, without testimony from a vocational expert, is sufficient to assess whether a claimant is able to work or is disabled under the Act. *See Heckler v. Campbell,* 461 U.S. 458, 467, 470, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983). As the Supreme Court explained in *Campbell:*

> These guidelines relieve the Secretary of the need to rely on vocational experts by establishing through rulemaking the types and numbers of jobs that exist in the national economy. They consist of a matrix of the four factors identified by Congress—physical ability, age, education, and work experience—and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy. Where a claimant's qualifications correspond to the job requirements identified by a rule, the guidelines direct a conclusion as to whether work exists that the claimant could perform. If such work exists, the claimant is not considered disabled.

461 U.S. at 461–62, 103 S.Ct. 1952 (footnotes omitted). The Court elaborated:

> Each of these four factors is divided into defined categories. A person's ability to perform physical tasks, for example, is categorized according to the physical exertion requirements necessary to perform varying classes of jobs—*i.e.,* whether a claimant can perform sedentary, light, medium, heavy, or very heavy work. 20 C.F.R. § 404.1567. Each of these work categories is defined in terms of the physical demands it places on a worker, such as the weight of objects [she] must lift and whether extensive movement or use of arm and leg controls is required. *Ibid.*

*Id.* at 462 n. 3, 103 S.Ct. 1952.

"Under the regulations, impairments can be either exertional or nonexertional." *Sykes v. Apfel,* 228 F.3d 259, 263 (3d Cir. 2000). "Impairments are classified as exertional if they affect the claimant's ability to meet the strength demands of jobs." *Id.* " 'The classification of a limitation as exertional is related to the United States Department of Labor's classification of jobs by various exertional levels (sedentary, light, medium, heavy, and very heavy) in terms of the strength demands for sitting, standing, walking, lifting, carrying, pushing, and pulling.' " *Id.* (quoting 20 C.F.R. § 404.1569(a)). "All other impairments are classified as nonexertional." *Id.*

In evaluating RFC, the Fifth Circuit has looked to SSA rulings ("SSR"). "The So-

cial Security Administration's rulings are not binding on this court, but they may be consulted when the statute at issue provides little guidance." *Myers,* 238 F.3d at 620 (citing *B.B. ex rel. A.L.B. v. Schweiker,* 643 F.2d 1069, 1071 (5th Cir.1981)). In *Myers,* the Fifth Circuit relied on SSRs addressing residual functional capacity and the interplay of exertional and nonexertional factors:

> First, SSR 96–8p provides that a residual functional capacity (RFC) "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." "The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." "However, without the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work...." RFC involves both exertional and nonexertional factors. Exertional capacity involves seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling. "Each function must be considered separately." "In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis...." The RFC assessment must include a resolution of any inconsistencies in the evidence.

*Id.* (quoting 61 Fed.Reg. 34474–01 (July 2, 1996)). The court also noted that SSR 96–9p "defines exertional capacity as the aforementioned seven strength demands and requires that the individual's capacity to do them on a regular continuing basis

be stated." *Id.* Thus, to determine that an applicant can do a given type of work, the ALJ must find that the applicant can meet the job's exertional and nonexertional requirements on a sustained basis and can maintain regular employment. *See Watson,* 288 F.3d at 218; *Singletary v. Bowen,* 798 F.2d 818, 821 (5th Cir.1986); *Carter,* 712 F.2d at 142 (citing *Dubose v. Mathews,* 545 F.2d 975, 977–78 (5th Cir.1977)).

When a claimant suffers only exertional impairments and an ALJ's findings of residual functional capacity, age, education, and previous work experience coincide with the grids, the Commissioner may rely exclusively on the medical-vocational guidelines to determine whether work exists in the national economy which the claimant can perform. *See Newton,* 209 F.3d at 458 (citing *Fraga,* 810 F.2d at 1304); 20 C.F.R. § 404.1569(b). Nevertheless, "use of the grid rules is only appropriate 'when it is established that the claimant suffers only from exertional impairments, or that the claimant's nonexertional impairments do not significantly affect [her] residual functional capacity.'" *Watson,* 288 F.3d at 216 (quoting *Crowley,* 197 F.3d at 199); *accord Loza,* 219 F.3d at 398; *Newton,* 209 F.3d at 458. If the claimant suffers from nonexertional impairments or a combination of exertional and nonexertional impairments, then the Commissioner must rely on a vocational expert to establish that suitable jobs exist in the economy. *See id.* Therefore, before applying the grids, it must be determined whether nonexertional factors, such as mental illness, significantly affect a claimant's RFC. *See Loza,* 219 F.3d at 399; *Newton,* 209 F.3d at 459.

In the case at bar, the ALJ found that Robinson had a severe impairment, including a deformed foot, high blood pressure, and depression, and that the combined effect of these impairments imposed significant limitations on her ability to

perform work-related activities. Nonetheless, as Robinson points out, the ALJ did not consult a medical expert to assess the functional impact of her depression when determining her RFC. Instead, the ALJ discounted Dr. Dailey's assessment of Robinson's physical and mental limitations based primarily on conflicting evidence from a vocational expert concerning her physical capacity alone, finding that she retained the RFC to perform work in the light range of exertion. The ALJ made no mention of her depression or other nonexertional factors that could affect her ability to work:

> Although Dr. Warren Dailey, a family practitioner and treating physician, stated on July 9, 2001, that the claimant had a severe limitation in her ability to deal with work stress (Exhibit B16F, page 3), and limited physical capacity for work (Exhibit B16F, page 3), the undersigned finds this assessment not consistent with the objective record as a whole. The claimant's recent post-hearing vocational report reflects her ability to perform at least light work, with no difficulties observed in sitting, standing, walking, bending, crouching, squatting, kneeling, reaching, or handling/fingering. Her physical capacity did not correspond with that of a person with cerebral palsy. (Exhibit B10E, page 3).
>
> Accordingly, the undersigned finds that the claimant retains the following residual functional capacity: the light range of exertion.

Then, without obtaining an opinion from a medical expert regarding the effect of Robinson's depression on her RFC or any testimony from a vocational expert addressing her mental limitations, the ALJ turned to the medical-vocational guidelines and concluded that she was not disabled. He did not consider any evidence in addition to the grids in making his determination that there were jobs in the national economy that Robinson could perform and

that she was not disabled as defined in the Act. The ALJ stated:

> The claimant's age, education, and vocationally relevant past work experience, if any, must be viewed in conjunction with the medical-vocational guidelines of Appendix 2 of Subpart P of the Regulations, which contain a series of rules that may direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's residual functional capacity and vocational profile.
>
> Born on August 22, 1966, the claimant is currently 35 years old. This is defined in the regulations as a younger individual (20 CFR § 416.963). She has a limited education and has no transferable skills since past relevant work has not been performed during the relevant period.
>
> On the basis of the record, the undersigned finds that medical-vocational rule 202.17 directs a conclusion that the claimant is not disabled and that there are a significant number of jobs in the national economy that the claimant can perform given her residual functional capacity as well as other vocational factors, of which administrative notice is taken. The claimant can perform work in the light range of exertion in the unskilled job base.
>
> The claimant was not under a "disability" as defined in the Social Security Act, at any time since her application was protectively filed on March 30, 1999, through the date of this decision (20 CFR § 416.920(f)).

The record is replete, however, with evidence documenting Robinson's depression. Indeed, the ALJ found that Robinson was shown to have "medically determinable impairments (depression)." Dr. Dailey, her treating physician since 1998, made numerous notations regarding her depression over a three-year period. The record reflects that on October 1, 1999, Robinson

presented to Dr. Dailey complaining of depression, headache, and back pain. In a physician's statement dated October 1, 1999, Dr. Dailey listed a diagnosis of cerebral palsy, stated that Robinson could not work due to a physical disability, and described her prognosis as poor. At a follow-up visit on October 8, 1999, she was still complaining of feelings of depression and not being able to sleep. Dr. Dailey diagnosed her as having depression and prescribed medication for the condition. On October 29, 1999, he commented that she was suffering from insomnia at night and added that she had requested a letter of disability. On November 29, 1999, Dr. Dailey's impression at a follow-up visit was that Robinson was in a "depressed mood."

A medical record from Dr. Dailey dated September 25, 2000, indicates that Robinson was taking Elavil,[5] an antidepressant. On October 24, 2000, Robinson complained of being "stressed out" and discussed "giving up" with Dr. Dailey. He again diagnosed her with depression, noting her "depressed mood" and "flat affect." He prescribed another antidepressant, Effexor.[6] At a follow-up visit on November 7, 2000, Dr. Dailey also noted her "flat affect." Robinson advised Dr. Dailey on

March 30, 2001, that she was still feeling depressed and was suffering from insomnia for which he prescribed Atarax.[7] On July 9, 2001, Dr. Dailey completed an RFC questionnaire regarding Robinson in which he listed diagnoses of cerebral palsy and hypothyroidism[8] and rated her prognosis as poor. In the questionnaire, Dr. Dailey identified Robinson's depression as a psychological condition affecting her physical condition, stated that emotional factors contributed to the severity of her symptoms and functional limitations, and described her as having a severe limitation in dealing with work stress. He specifically stated that Robinson was not a malingerer.

Dr. Dailey's assessment that Robinson was suffering from depression and other medical problems is consistent with the opinions of several other doctors, who reached the same conclusion both before and after she was under Dr. Dailey's care. For example, G.K. Ravichandran, M.D. ("Dr.Ravichandran"), evaluated Robinson on February 7, 1996, for complaints of "severe depression" and "bad nerves." Dr. Ravichandran diagnosed Robinson as having paranoid schizophrenia,[9] organic brain syndrome,[10] atypical psychosis,[11] and

---

5. "Elavil" is "amitriptyline hydrochloride," "an antidepressant with sedative effect." PHYSICIANS' DESK REFERENCE 549 (44th ed.2000).

6. "Effexor" is "venlafaxine hydrochloride," "a structurally novel antidepressant." PHYSICIANS' DESK REFERENCE, supra, at 3232.

7. "Atarax" is "hydroxyzine hydrochloride," a medication "[f]or symptomatic relief of anxiety and tension associated with psychoneurosis and as an adjunct in organic disease states in which anxiety is manifested." PHYSICIANS' DESK REFERENCE, supra, at 2324–25.

8. "Hypothyroidism" is a "deficiency of thyroid activity. In adults, it is most common in women and is characterized by decrease in metabolic rate, fatigue and lethargy, sensitivi-

ty to cold, and menstrual disturbances." DORLAND'S, supra, at 811.

9. "Paranoid schizophrenia" is a mental disorder "characterized by preoccupation with one or more systematized delusions or with frequent auditory hallucinations related to a single theme." DORLAND'S, supra, at 1492.

10. "Organic brain syndrome" is characterized by "a constellation of psychological or behavioral signs and symptoms associated with one or more specific organic etiologic factors; grouped according to symptoms rather than etiology." DORLAND'S, supra, at 1636.

11. "Psychosis" is a "mental disorder characterized by gross impairment in reality testing as evidenced by delusions, hallucinations,

mild mental retardation, with an IQ score of 57. He found evidence of a specific organic dysfunction as well as cognitive impairment which could be associated with her long history of psychiatric illness. Dr. Ravichandran ordered a brain scan, which was performed on February 8, 1996, at Hermann Hospital. The brain scan revealed several abnormalities, including a "[p]rominent interhemispheric fissure, suggesting cerebral atrophy," a "[f]ocal area of increased activity involving the left posterior frontal/sensory motor region," and "[d]ecreased left caudate nucleus superiorly and deep nuclei on the right." On August 20, 1997, Dr. Ravichandran diagnosed Robinson with depression, anxiety, and psychosis and prescribed two medications for these conditions—Thorazine [12] and Ativan.[13] On October 29, 1997, Dr. Ravichandran concluded that Robinson had several medical problems, including depression with hallucinatory features, and that her appetite and sleep were poor. He continued her on the same medications.

Although Dr. Yohman opined on September 24, 1998, that Robinson had a profile typical of malingerers and that IQ testing could underestimate her native abilities, he noted that she scored in the mild mental retardation range of intellectual functioning with a full scale IQ of 56. This IQ score is consistent with Dr. Ravichandran's finding of an IQ of 57. Dr. Yohman further indicated that Robinson had taken 25 mg of Thorazine twice a day for six years, suggesting the presence of a

mental illness. In any event, Dr. Yohman assessed Robinson's mental condition before her most recent suicide attempt in January 1999. Included in the record are medical reports from the Harris County Hospital District's LBJ General Hospital ("LBJ Hospital") documenting Robinson's emergency room admission on January 1, 1999, due to an overdose of antidepressant medication, later identified as Thorazine. The hospital records reflect a history of cerebral palsy and depression. Robinson reported that she had taken 15 tablets of Thorazine and that she had experienced suicidal ideations when taking them. Physicians at LBJ Hospital characterized the incident as a "drug overdose-suicide attempt" likely from "illicit drug use." On October 12, 1999, Robinson completed a supplemental questionnaire for the SSA in which she admitted that she was "trying to commit suicide." On October 25, 1999, Robinson submitted another supplemental questionnaire in which she commented that she felt like taking pills or killing herself.

On October 25, 1999, Manjul R. Mehra, M.D. ("Dr.Mehra"), examined Robinson, whose chief complaint was that she had suffered from depression for six years. He determined that Robinson had borderline intelligence and observed that she was displaying a "moderately depressed mood with a constricted effect." Dr. Mehra noted that Robinson was taking 50 mg of Thorazine daily. He further indicated that

markedly incoherent speech, or disorganized and agitated behavior without apparent awareness on the part of the patient of the incomprehensibility of his behavior." DORLAND's, *supra,* at 1383.

12. "Thorazine" is a "brand name of chlorpromazine," a medication used "[f]or the management of manifestations of psychotic disorders" and "of the manic type of manic-depressive illness." PHYSICIANS' DESK REFERENCE, *supra,* at 3050.

13. "Ativan" is a brand name of "lorazepam," "an antianxiety agent." PHYSICIANS' DESK REFERENCE, *supra,* at 3215. Lorazepam is "a benzodiazepine with anxiolytic and sedative effects, administered orally in the treatment of anxiety disorders and short-term relief of anxiety symptoms and as a sedative-hypnotic agent." DORLAND's, *supra,* at 960.

Robinson manifested "vegetative symptoms of sleep problems" and reported "suicidal ideas off and on, with history of 4 suicidal attempts in the past." In addition, he related that she reported hearing voices in the night, sometimes telling her to harm her family. Dr. Mehra described her concentration, persistence, and pace as poor. He diagnosed Robinson as having major depression with psychosis, dependent personality, and hypertension. He described her prognosis as guarded. Dr. Mehra also opined that Robinson could not understand the meaning of filing for benefits.

At the hearing on July 20, 2001, Robinson gave the following testimony regarding her depression:

> Q Do you have trouble sleeping at night?
>
> A Oh, yes. Yes, I do. I have a hard time sleeping and some time I don't go to sleep until about 4:30 in the morning.
>
> Q What, what keeps you up?
>
> A Yeah. I just be depressed mostly. I stay depressed a whole lot.
>
> Q What time do you get up in the morning?
>
> A 7:00—well, I got up at 6:30 this morning because I was up, I was up, I think, mostly tossing and turning because here lately, I've just been depressed because I had just lost my father. My father died last, last month.

In a post-hearing psychological evaluation performed on August 24, 2001, Dr. Paterson diagnosed Robinson as having a depressive disorder not otherwise specified and probable borderline intellectual functioning, although he noted that the validity of some exam results was questionable. Dr. Paterson stated, "Overtly, Ms. Robinson appears generally physically healthy but depressed," noting that her "affect seemed depressed during the exam." He detected no active psychoses but described Robinson as "pessimistic, introspective, and a chronic worrier who broods and ruminates about herself and her problems." He also rated her ability to deal with work stress as poor. Dr. Paterson further found her academic skills to be severely deficient and that there was evidence of "underlying perceptual-motor dysfunction and short-term memory defects." He added that if benefits were assigned, she would require assistance managing her funds.

Finally, in Alfred's vocational evaluation dated September 4, 2001, he opined that Robinson appeared to have the physical capacity to perform at least light work. Nevertheless, he described her performance as "characteristic of a person with mental retardation." Alfred explained:

> She was unable to maintain instructions or perform work without continued supervision. She was unable to recognize work errors, had little or no understanding of work procedures, and had no understanding of the meaning of or value of work. Her work pace was slow and haphazard.

■ Despite the plethora of evidence from multiple sources and his own finding that Robinson had mental impairments, the ALJ did not incorporate her mental limitations in his assessment of her RFC. Then, although he had found that the combination of her impairments, including depression, imposed significant limitations on her ability to perform work-related activities, he relied solely on the grid rules to determine her ability to perform gainful activity in the national economy. Under these circumstances, there was not substantial evidence in the record indicating that Robinson suffered only from exertional impairments or that her nonexertional impairments did not significantly affect her RFC. Therefore, the ALJ's reliance on the medical-vocational guidelines alone was improper.

■ Furthermore, especially when mental illness is involved, as in this case, " '[a] finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that [she] can physically perform certain jobs; it also requires a determination that the claimant can hold whatever job [she] finds for a significant period of time.' " *Watson,* 288 F.3d at 217 (quoting *Singletary,* 798 F.2d at 822). The claimant "must have some reasonable chance in the real world of being hired and, once hired, of keeping the job." *Wingo v. Bowen,* 852 F.2d 827, 830 (5th Cir.1988); *accord Watson,* 288 F.3d at 217. In view of Robinson's mental limitations, her lack of any prior employment history, and Alfred's assessment of her work ethic, *i.e.,* that she had no understanding of the meaning and value of work, it would appear that Robinson's chance in the real world of being hired and, once hired, of keeping the job was almost nil. In any event, it is undisputed that the ALJ made no such finding, as required by Fifth Circuit precedent. Accordingly, this case must be remanded for an evaluation of the effect of Robinson's mental impairments on her RFC and an assessment of her vocational prospects independent of the grids.

2. *Weight Assigned to Treating Physician's Opinion*

■ Robinson further asserts that the ALJ failed to afford the proper weight to the opinion of her treating physician, Dr. Dailey. "[T]he opinion, diagnosis and medical evidence of the treating physician, especially when the consultation has been over a considerable length of time, should be accorded considerable weight" in determining disability. *Perez v. Schweiker,* 653 F.2d 997, 1001 (5th Cir.1981); *accord Myers,* 238 F.3d at 621; *Loza,* 219 F.3d at 395; *Greenspan,* 38 F.3d at 237; *Scott v. Heckler,* 770 F.2d 482, 485 (5th Cir.1985).

"Generally, the longer a treating source has treated [the claimant] and the more times [the claimant has] been seen by a treating source, the more weight [the SSA] will give to the source's medical opinion." 20 C.F.R. § 416.927(d)(2)(i). Medical opinions are given deference, however, only if those opinions are shown to be more than conclusory and supported by clinical and laboratory findings. *See Scott,* 770 F.2d at 485; *see also Oldham,* 660 F.2d at 1084. "A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with ... other substantial evidence.' " *Newton,* 209 F.3d at 455 (quoting *Martinez,* 64 F.3d at 176 (citing 20 C.F.R. § 404.1527(d)(2))); *see also* 20 C.F.R. § 416.927(d)(2).

■ It is well settled, however, that "[e]ven though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, 'the ALJ has sole responsibility for determining a claimant's disability status.' " *Newton,* 209 F.3d at 455 (quoting *Paul v. Shalala,* 29 F.3d 208, 211 (5th Cir.1994)); *accord Myers,* 238 F.3d at 621. Thus, upon a showing of good cause, a treating physician's opinions may be assigned little or no weight. *See id.; Loza,* 219 F.3d at 395; *Greenspan,* 38 F.3d at 237. Good cause may permit an ALJ to discount the weight of a treating physician's opinion in favor of other experts when the treating physician's evidence is conclusory, unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence. *See Myers,* 238 F.3d at 621; *Newton,* 209 F.3d at 456 (citing *Brown,* 192 F.3d at 500; *Greenspan,* 38 F.3d at 237; *Paul,* 29 F.3d at 211).

■■■ " 'Medically acceptable evidence includes observations made by a physician during physical examination and is not limited to the narrow strictures of laboratory findings or test results.' " *Loza*, 219 F.3d at 393 (quoting *Ivy v. Sullivan*, 898 F.2d 1045, 1048–49 (5th Cir. 1990)). If the medical evidence supports a physician's diagnosis " '[t]he expert opinion[ ] of a treating physician as to the existence of a disability [is] binding on the fact-finder unless contradicted by substantial evidence to the contrary.' " *Id.* (quoting *Bastien v. Califano*, 572 F.2d 908, 912 (2d Cir.1978)); *see also* 20 C.F.R. § 416.927(d)(2). Under the regulations, " '[e]vidence' includes medical history, statements of the claimant, decisions by any governmental or non-governmental agency, and findings made by the administrative law judge levels." *Loza*, 219 F.3d at 393 (citing 20 C.F.R. § 404.1512(b)(1)-(6)); *accord* 20 C.F.R. § 416.912(b)(1)-(6). "[T]he ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position." *Loza*, 219 F.3d at 393.

The Social Security Regulations provide a framework for the consideration of expert medical opinions of a claimant's treating physician. Under 20 C.F.R. § 416.927(d)(2), consideration of a treating physician's opinion must be based on:

(1) the physician's length of treatment of the claimant,

(2) the physician's frequency of examination,

(3) the nature and extent of the treatment relationship,

(4) the support of the physician's opinion afforded by the medical evidence of record,

(5) the consistency of the opinion with the record as a whole, and

(6) the specialization of the treating physician.

*Newton*, 209 F.3d at 456 (citing 20 C.F.R. § 404.1527(d)(2)); *accord Myers*, 238 F.3d at 621; *see also* 20 C.F.R. 416.927(d)(2). In this regard, SSR 96–2p provides:

> [A] finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. *Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927.* In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted even if it does not meet the test for controlling weight.

*Newton*, 209 F.3d at 456 (emphasis in original) (quoting 61 Fed.Reg. 34490, 34491 (July 2, 1996)). Additionally, with respect to residual functional capacity assessments and medical source statements, SSR 96–5p provides that " '[a]djudicators must weigh medical source statements under the rules set out in 20 C.F.R. § 404.1527 ..., providing appropriate explanations for accepting or rejecting such opinions.' " *Id.* (quoting 61 Fed.Reg. 34471, 34474 (July 2, 1996)); *see also* 20 C.F.R. § 416.927. Indeed, the majority of courts, including the Fifth Circuit, have concluded that an ALJ must consider each of the § 416.927(d) factors before rejecting or affording little weight to a treating physician's opinion. *See Newton*, 209 F.3d at 456; *see also Myers*, 238 F.3d at 621.

■■ Where there are gaps or deficiencies in the administrative record regarding a treating physician's diagnosis or opinion which can be filled or rectified with additional information, the ALJ, prior to rejecting the diagnosis or opinion, is obliged

to develop the record fully by seeking additional information or explanations from the treating physician. *See Newton,* 209 F.3d at 457–58 (citing *Rosa v. Callahan,* 168 F.3d 72, 79 (2d Cir.1999) (citing *Schaal v. Apfel,* 134 F.3d 496, 505 (2d Cir.1998))); *see also* 20 C.F.R. § 416.912(d). "The Fifth Circuit ... imposes a duty on an ALJ 'to develop the facts fully and fairly relating to an applicant's claim for disability benefits.'" *Newton,* 209 F.3d at 458 (quoting *Ripley,* 67 F.3d at 557); *see also* 20 C.F.R. § 416.912(d). "'If the ALJ does not satisfy his duty, his decision is not substantially justified.'" *Newton,* 209 F.3d at 458 (quoting *Ripley,* 67 F.3d at 557).

■■■■■ As to the requirement to obtain supplemental information, SSR 96–2p admonishes:

> [I]n some instances, additional development required by a case—for example to obtain more evidence or to clarify reported clinical signs or laboratory findings—may provide the requisite support for a treating source's medical opinion that at first appeared to be lacking or may reconcile what at first appeared to be an inconsistency between a treating source's medical opinion and the other substantial evidence in the case record ....

*Id.* at 457 (quoting 61 Fed.Reg. at 33491). Moreover, the framework for seeking additional information from a treating physician is set forth in 20 C.F.R. § 416.912(e), as follows:

> (e) Recontacting medical sources. When the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled, we will need additional information to reach a determination or a decision. To obtain the information, we will take the following actions.

> (1) We will recontact your treating physician or psychologist or other medical source to determine whether the additional information we need is readily available. We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques ....

> (2) We may not seek additional evidence or clarification from a medical source when we know from past experience that the source either cannot or will not provide the necessary findings.

20 C.F.R. § 416.912(e). Where doubts are raised about a treating physician's diagnosis and/or opinion and additional information could eliminate those doubts, a remand to the SSA for further consideration may be warranted. *See Newton,* 209 F.3d at 457–58; *see also Myers,* 238 F.3d at 621. "Reversal, however, is appropriate only if the applicant shows prejudice from the ALJ's failure to request additional information." *Newton,* 209 F.3d at 458 (citing *Ripley,* 67 F.3d at 557). "'Prejudice can be established by showing that additional evidence would have been produced if the ALJ had fully developed the record, and that the additional evidence might have led to a different decision.'" *Id.* (quoting *Ripley,* 67 F.3d at 557 n. 22).

In the case at bar, on an RFC questionnaire dated July 9, 2001, Dr. Dailey, Robinson's treating physician since 1998, diagnosed her with cerebral palsy and hypothyroidism, describing her prognosis as poor. He elaborated that her symptoms included pain, weakness, and headaches and that she suffered from pain at multiple joint sites continuously and severely.

Dr. Dailey listed the clinical findings and objective signs as decreased range of motion, unstable gait, and pain on flexion. He further identified her depression as a psychological condition affecting her physical condition. Dr. Dailey opined that as a result of Robinson's physical condition and other limitations, including her depression, she was incapable of spending 2 hours sitting or 2 hours standing and walking in an 8–hour work day. He also stated that she would need to take 30–minute rest breaks hourly, that she had profoundly limited use of her upper extremities, and that her impairments would cause her to be absent from work more than three times per month, on average. In addition, Dr. Dailey found that she had a severe limitation with regard to her ability to deal with work stress. In his psychological evaluation of Robinson on August 24, 2001, Dr. Paterson concurred that her ability to deal with work-related stress was poor.

The ALJ rejected Dr. Dailey's diagnosis of cerebral palsy, seemingly on the basis of the opinion of Alfred, a vocational evaluator, who declared that Robinson's physical capacity did not correspond with that of a person with cerebral palsy. Alfred, however, is not a physician and is not competent to render a medical diagnosis or opinion regarding the existence or etiology of a disease. *See Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir.1996); *Ball v. Principi*, No. 00–915, 2002 WL 1578714, at *1 (Vet.App. July 17, 2002) (citing *Espiritu v. Derwinski*, 2 Vet.App. 492, 494 (1992));

*Jones v. West*, 16 Vet.App. 290, 1998 WL 732811, at *4 (Vet.App. Oct. 15, 1998); *Heuer v. Brown*, 7 Vet.App. 379, 384 (1995); 20 C.F.R. § 416.913(a); *see also Standard v. Union Pac. R.R. Co.*, 34 Fed. Appx. 629, 636 (10th Cir.2002); *Hickman v. Apfel*, 187 F.3d 683, 688 (7th Cir.1999).

The record is replete with references to Robinson's history of cerebral palsy, including a comment by Irwin S. Novak, M.D. ("Dr.Novak"), on April 10, 1997, that she had been diagnosed as a cerebral palsy patient by Dr. Faize several years previously. The record, however, does not include any diagnostic data or medical records from Dr. Faize. On examination, Dr. Novak, like Dr. Dailey, observed that Robinson was experiencing pain, especially in her feet and legs, noting a deformity and inflammation in her right foot. On November 11, 1999, Barry N. Hyman, M.D. ("Dr.Hyman"), an internist and consultative examiner, assessed Robinson. His impression was that she was suffering from cerebral palsy, weakness in her lower extremities, and insomnia. Dr. Hyman further noted that she appeared to be "a little slow in answering questions." On December 6, 2000, Samuel B. Pegram, M.D. ("Dr.Pegram"), a rheumatologist, consulted with Robinson regarding her complaints of pain in her back, legs, shoulders, and hands. Dr. Pegram's impression was that she was suffering from diffuse pain syndrome and also noted a history of cerebral palsy. He recommended several medications, including Soma,[14] Sulindac,[15] and Darvocet–N.[16] As for Dr. Dailey's

---

**14.** "Soma" is a muscle relaxant, analgesic medication used "as an adjunct to rest, physical therapy, and other measures for the relief of pain, muscle spasm, and limited mobility ...." PHYSICIANS' DESK REFERENCE, *supra*, at 3161.

**15.** "Sulindac is a non-steroidal, anti-inflammatory" drug. PHYSICIANS' DESK REFERENCE, *supra*, at 1756.

**16.** "Darvocet–N" contains "propoxyphene napsylate and acetaminophen tablets." "Proxyphene is a mild narcotic analgesic, .... indicated for the relief of mild to moderate pain ...." PHYSICIANS' DESK REFERENCE, *supra*, at 1574.

diagnosis of hypothyroidism, a laboratory report dated January 30, 1998, from Park Plaza Hospital reflects thyroid readings outside normal ranges. Hence, the opinions of other physicians and laboratory test results were consistent, at least in part, with Dr. Dailey's diagnoses.

As for Robinson's mental condition, the ALJ specifically relied on Dr. Yohman's September 14, 1998, psychological evaluation regarding her mental limitations, which was conducted prior to her suicide attempt in January 1999. According to Dr. Yohman, Robinson exhibited no evidence of psychopathology but did exhibit evidence of malingering. On that basis, Judge Williams determined that Robinson could engage in light work. The ALJ's decision, however, does not contain a reasoned analysis, based on the evidence in the record and the factors set forth in the regulations, as to why he favored the 1998 opinion of Dr. Yohman over the assessments of Dr. Dailey, her treating physician of several years, Dr. Ravichandran, who treated her in 1997, and Dr. Mehra, who examined her on October 25, 1999. The ALJ merely stated that he did not give the opinion of Dr. Dailey controlling weight in the evaluation of the case because "he finds the assessment not consistent with the objective record as a whole." The ALJ failed to set forth specific reasons for his rejection or disregard of the opinions of Robinson's treating physician and of other physicians, who concurred, at least in part, with Dr. Dailey's findings.

In this situation, the ALJ improperly rejected or accorded little weight to the findings and opinions of Dr. Dailey without considering the factors set forth in 20 C.F.R. § 416.927 and without recontacting Dr. Dailey for clarification as required by 20 C.F.R. § 416.912. The Fifth Circuit has made clear that even if a treating physician's report is not entitled to controlling weight, the ALJ must still evaluate it un-der the factors applicable to the consideration of all medical evidence. *See Newton,* 209 F.3d at 456. Specifically, in *Newton,* the court held:

> absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 1527(d)(2). Additionally, if the ALJ determines that the treating physician's records are inconclusive or otherwise inadequate to receive controlling weight, absent other medical opinion evidence based on personal examination or treatment of the claimant, the ALJ must seek clarification or additional evidence from the treating physician in accordance with 20 C.F.R. § 404.1512(e).

209 F.3d at 453 (emphasis in original); *accord Barrientoz v. Massanari,* 202 F.Supp.2d 577, 591 (W.D.Tex.2002).

Here, the ALJ did not recontact Dr. Dailey for a clarification of the basis of his opinion, even though Dr. Dailey's numerous, hand-written, progress notes are difficult to read. Judge Williams did not apply the criteria set forth in 20 C.F.R. § 416.927 in weighing the evidence and did not explain why there was no need to recontact Dr. Dailey. Moreover, the ALJ failed to justify his reliance on the opinion of a nontreating neuropsychologist to the exclusion of those expressed by Robinson's treating physician as well as other consultative examiners. At a minimum, recontacting Dr. Dailey to decipher his treatment notes and/or to obtain additional information would have been warranted. *See Barrientoz,* 202 F.Supp.2d at 591 (court found that "ALJ lacked good cause to summarily reject the treating physician's evidence that plaintiff suffered from

peripheral neuropathy without first seeking additional information from [the treating physician] or referring plaintiff for the needed medical testing").

"The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Newton,* 209 F.3d at 455. In this instance, contrary to the requirements of *Newton,* the applicable regulations, and the pertinent SSRs, the ALJ failed to set forth adequately the reasons for his rejection or disregard of the opinions of Robinson's primary treating physician and those of other physicians. Instead, in a conclusory manner, the ALJ accepted the RFC assessment arrived at by a nontreating psychologist, Dr. Yohman, to the exclusion of other sources and failed to state his reasons for preferring Dr. Yohman's opinion over those of sources more favorable to Robinson.

The ALJ's disregard for the opinions of Robinson's treating physician and other examining experts with similar views, without weighing all the evidence under the criteria set forth in the regulations, is not a viable option under *Newton.* Consequently, given the ALJ's incomplete analysis and failure to accord any deference to the expert medical opinions of Robinson's treating physician without first seeking clarification, the ALJ's finding of no disability is not supported by substantial evidence. Pursuant to *Newton* and *Myers,* this case must be remanded to the SSA for a proper evaluation of the medical evidence, including the opinions of Dr. Dailey and, if appropriate, to allow for the submission of supplemental information from Dr. Dailey and/or an additional consultative examination.

### III. *Conclusion*

Accordingly, Barnhart's Motion for Summary Judgment is denied, Robinson's Motion for Summary Judgment is granted in part, the ALJ's decision is reversed, and the case is remanded to the SSA for further consideration consistent with this opinion.

IT IS SO ORDERED.